## NATIONAL LABOR RELATIONS BOARD v. STEWART et al.
### No. 14380.

United States Court of Appeals
Fifth Circuit.

Sept. 9, 1953.

Rehearing Denied Oct. 8, 1953.

Thomas F. Maher, Atty., A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Associate Gen. Counsel, George J. Bott, Gen. Counsel, Bernard Dunau, Atty., National Labor Relations Board, Washington, D. C., for petitioner.

George E. Seay, Dallas, Tex., Chas. F. Potter, Tyler, Tex., Paul Branch, Kilgore, Tex., Lasseter, Spruiell, Lowry, Potter & Lasater, Tyler, Tex., Malone, Lipscomb & Seay, Dallas, Tex., for respondents.

Before HUTCHESON, Chief Judge, and BORAH and RUSSELL, Circuit Judges.

BORAH, Circuit Judge.

This case is before the court on petition of the National Labor Relations Board, seeking enforcement of its order requiring respondents, W. E. Stewart and Lela Stewart, doing business as Stewart Oil Company, to cease and desist from discouraging membership in the Oil Workers International Union, C. I. O., or any other labor organization of their employees, by discharging or refusing to reinstate any of their employees, or by otherwise discriminating in regard to their hire, or tenure of employment; from refusing to bargain collectively with the union; from dealing individually with employees in derogation of their bargaining representative; from interrogating their employees concerning their union membership, threatening them with economic reprisal, or in any other manner interfering with, restraining, or coercing their employees in the exercise of their rights. The order further directed respondents to offer reinstatement to two employees and make them whole for any loss of pay they may have suffered by reason of respondents' discrimination against them; to make whole five additional employees; to bargain collectively with the Union upon request and embody any understanding

reached in a signed agreement; to make available to the Board certain records necessary to analyze the amounts of back pay due under the order; and to post appropriate notices.

 First, the respondents challenge the Board's finding that all pumpers, switchers, roustabouts, truck drivers and mechanics employed at respondents' East Texas Field constitute an appropriate unit for collective bargaining; and its further finding that on March 23, 1951, the Union represented seven of respondents' thirteen employees in such unit. We do not agree with the respondents that employees at their Louisiana field should also have been included in the unit. True there is some contact between the two fields, but there is very little interchange of personnel and the two fields are geographically separated by at least eighty miles. Moreover, we think that the Board did not err in including A. D. Adams in the unit. Although Adams temporarily substituted for one brief period for a supervisory employee who was absent due to illness, he was regularly employed as a roustabout, an admittedly nonsupervisory classification. Such occasional performance of supervisory duties does not make an employee a supervisor within the meaning of the Act. West Texas Utilities Company, Inc., 94 N.L.R.B. 1638, 1642, enforced by this court, 195 F.2d 519; N. L. R. B. v. Quincy Steel Casting Co., 1 Cir., 200 F. 2d 293, 296. Accordingly, we agree with the Board that on March 23, 1951, the Union represented seven of respondents' thirteen employees in an appropriate unit at its East Texas Field.

 Respondents next contend that the Board erred in finding that they violated sections 8(a) (1) and (3) of the Act by discharging pumpers G. T. Mc-Clure and Emmet R. Broadus on April 6, 1951, because they refused to sign individual contracts of employment at a time when the Union, as exclusive bargaining representative of a majority of respondents' employees in an appropriate unit, had made a request to bargain. The Board found that by requiring the two employees to sign individual employment contracts after they had selected a bargaining representative to negotiate a collective contract for them, respondents restrained and coerced their employees in the exercise of their statutory rights in violation of Section 8(a) (1); and it further found that by discharging Broadus and McClure upon their refusal to comply with respondents' requirement of signing such contract, respondents discriminated in regard to their hire and tenure of employment thereby discouraging membership in the Union in violation of Section 8(a) (3) of the Act. Respondents seemingly admit that under certain circumstances the Board might be correct in concluding as it did but seek to distinguish the instant case on the ground that there was no attempt to change or vary the existing terms of employment and the contracts as drawn were terminable at will by either party. However the vice of respondents' conduct lies in their insistence upon individual dealing when they were under a statutory obligation to engage in collective bargaining. Respondents also argue that their purpose in offering the individual contracts of employment was to satisfy the government's Wage and Hour investigators and they should not be penalized under the National Labor Relations Act for an act performed in compliance with the Fair Labor Standards Act.[1] The argument makes good sense so far as it goes but it is not available to respondents under the facts of this case for the purpose here of negotiating individual contracts was to "keep the Labor Board off him," meaning the company. We think the Fair Labor Standards Act and the National Labor Relations Act are not mutually exclusive but parts of harmonious legislation and that respondents may not insist on individually negotiated contracts of employment under the Fair Labor Standards Act when the National Labor Relations Act demands collective bargaining. This conclusion finds sup-

1. 63 Stat. 912, 29 U.S.C.A. § 207.

port in Section 7(e) of the Fair Labor Standards Act which specifically mentions and sanctions an agreement made as the result of collective bargaining by representatives of employees.

■ The third issue relates to the Board's finding that respondents interrogated their employees about union activities and uttered threats of reprisal in violation of Section 8(a) (1) of the Act. While the evidence as to unlawful interrogation is of debatable value, we are in no doubt that the record fully supports the finding that respondents threatened their employees with reprisal for their Union activities. Several employees testified that Assistant Superintendent Sanders quoted Superintendent Dorris as saying that he would automatically fire the first employee he caught with a union card.

■ The fourth issue concerns the Board's finding that respondents discharged employees Adams, Allen, Lindsey, Hodges, and Elmer R. Broadus on April 16, 1951, because of their membership in the Union, in violation of Section 8(a) (3) and (1) of the Act. On April 16, 1951, after the Union had made repeated attempts to secure recognition and bargaining conferences, Superintendent Dorris notified the above-named men, who were regularly employed on the two pulling units then in use at the East Texas Field, that the pulling machines would be "stacked" for thirty days and during this period of time the work would be contracted to outside firms to ascertain whether it could be done more economically. When one of the employees asked whether this meant that he had better look for another job, Dorris replied in the affirmative. However, despite these statements of Dorris the machines did not remain "stacked" for thirty days. The Trial Examiner and the Board found that both machines were operating within a few days after April 16, and, although the record does not definitely disclose the exact date when the machines were put back in operation, it is reasonably clear that within two weeks thereafter operations were re-

sumed and new employees were hired. Petitioner contends that the evidence conclusively demonstrates that respondents entertained no *bona fide* plan to curtail operations for economy reasons and the shutdown was a mere sham used by respondents *in order to get rid of the* Union men. On the other hand respondents now contend that the layoff was occasioned by the need for repairs to the machines and there can be no doubt that extensive repairs were made during the shutdown. We think petitioner's strongest point is the fact that the only employee notified that operations were to be resumed was the one nonunion man laid off. In response to this fact respondents argue that they were under no duty to notify their employees of a resumption of operations and if the men had reported for work daily during the layoff they would have been informed as to respondents' plans. But, why should the men *report for work each morning when they* had been laid off for thirty days and had been told they might as well seek other employment? Be that as it may, the question is a close one, but after carefully considering all of the evidence and bearing in mind that this court is not here to try the case *de novo*, we are of opinion that on the record considered as a whole there is substantial evidence to support the Board's findings.

■ The Board found that on or about March 26, 1951, and at all times thereafter, the respondents in violation of Section 8 (a) (5) and (1) of the Act refused to bargain collectively with the Union as the exclusive representative of the employees in the unit found appropriate. The pertinent facts are these: On March 23, 1951, the Union addressed a letter to Stewart Oil Company, Route No. 2, Longview, Texas, attention Carl Dorris, District Superintendent. The letter recited that the Union represented a majority of respondents' employees in the general area of the East Texas Oil Field, excluding employees such as supervisors, and requested recognition and a meeting to negotiate a contract. When respondents failed to reply to the letter the Union

filed a representation petition and on the same day, April 4, 1951, the Board informed respondent of the Union's petition. On April 5, 1951, the Union wrote another letter to respondents and on the day following respondents unlawfully discharged Broadus and McClure for refusal to sign individual contracts of employment. These discharges, of course, reduced the union membership from seven out of thirteen employees in the appropriate unit to five out of thirteen. On April 9, Union representative Mattern, in a telephone conversation with respondent, W. E. Stewart, reiterated the Union's request for recognition and a meeting with respondents. Stewart stated that he had no reason to recognize the Union and evaded a direct reply to the request for a meeting. Thereafter, Mattern confirmed the substance of the tele-

phone conversation in a letter to Stewart and on April 11, Stewart wrote to Mattern that he did "not concur with the statements made in your letter nor with the claims which you assert." On the same day respondents informed the Board that they would not agree to a consent election because they had "been furnished with no evidence that the Oil Workers International Union, C. I. O. represents a sufficient number" of their employees. Finally, on April 16, respondents discharged the five employees in violation of the Act.

The first, and perhaps most hotly contested question presented by this issue is whether respondents received the letter of March 23. We think there is ample evidence to support the Board's finding that respondents received the letter of March 23, 1951.[2]

2. The following are excerpts from the testimony of respondents' superintendent Dorris.

"A. Along that time, I don't know what it was, I got a letter, and so I was in the pickup and I was at a well one night. * * * I said, 'I have a letter here from the union. I believe I will open it and see what it is.' And I did and he looked over it, and I believed it stated— I can't say what all is in it—a majority of the union is in it. * * *

* * * * *

"Q. Now did you turn more than one letter over to Mr. Stewart concerning this? A. One letter is all, that is, except for a registered letter. I carried one letter in to him straight and one registered letter to me. Now, I don't know whether that was from the union or from the Labor Board. I don't know which one it was from.

* * * * *

"Q. How many other letters have you received from the union other than the one you have testified about? A. One registered letter.

"Q. Pardon. A. The letter that came to my house addressed to Dorris, Carl Dorris, that is the other one. Any mail that comes to my place addressed to Stewart Oil Company, I never open one of them.

"Q. How many other letters have you received addressed to the Stewart Oil Company, to your attention, from the union? A. Just two is all I remember of.

"Q. Do you remember the dates of those two? A. No, sir, I don't.

"Q. Well, you testified about one letter that you received. Now, what were the contents of the second letter? A. It was a registered letter. I don't know whether that letter was from the union or from the Labor Board. I couldn't say.

"Q. You told Mr. Sanders you had just received a letter from the union. That was your testimony. A. That's right. We opened it and read it.

"Q. Do you remember the contents of that letter? A. No, sir, I don't. I sure don't.

"Q. Do you remember whether or not the letter asked the company to recognize the union as the bargaining agent for certain of its employees? A. No, sir, I sure couldn't tell you what was in the letter.

"Q. Do you remember whether or not the letter stated that the Oil Workers International Union represented an overwhelming majority of your employees? A. I believe that's right.

"Q. What did you do with that letter? A. Now, I declare I don't know. I don't know whether I sent that letter in to the office or whether it laid out there on the desk or what happened to it. I sure don't.

"Q. Do you recall whether that letter was a letter dated about March 23, 1951? A. Well, I wouldn't remember no date because I never looked, never paid no attention to it. The fact of the business is I never attend to anything in the field

It is well recognized that an employer may withhold recognition from a Union representing a majority of his employees only if the employer in good faith doubts the Union's claims. As stated in Joy Silk Mills, Inc., v. N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732, 741:

"When however, such refusal is due to a desire to gain time and to take action to dissipate the union's majority, the refusal is no longer justifiable and constitutes a violation of the duty to bargain set forth in section 8(a) (5) of the Act."

Therefore, the question is whether substantial evidence on the record considered as a whole supports the Board's inference of fact that the refusal was prompted by bad faith. We think that when the entire facts surrounding the refusal to bargain are considered in the lights of the threats of reprisal for union membership, the attempt to negotiate individual contracts of employment and the discharges because of union membership, there is substantial evidence to support the Board's conclusion that the refusal to bargain was as ill-intentioned as employer's other actions.

Finally, respondents move the court to grant leave to adduce additional evidence with respect to whether their offers of reinstatement to Broadus and McClure were to substantially equivalent positions and would thus toll the back pay as of the date the offer was made. Since it clearly appears that the offers were to reinstate the men to the job of roustabout, and since the job of roustabout is a lower wage rated classification than pumper, and since it does not carry with it the fringe benefit of a house to live in, the offer would not constitute full reinstatement. Therefore, additional testimony to prove these facts would serve no useful purpose. Accordingly, the motion is denied.

For the reasons stated, the petition of the National Labor Relations Board for enforcement of its order against respondents is hereby

Granted.

like that and I never even gave any attention to it.

"Q. Well, was that letter, the one that you received from the union that stated that the Oil Workers International Union represented an overwhelming majority of your employees, now was that letter the first letter you remember receiving? A. That is the only one I remember of seeing."