NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LINDSAY NEWSPAPERS, INC.,
Respondent.

No. 19487.

United States Court of Appeals
Fifth Circuit.

April 4, 1963.

Stuart Rothman, General Counsel, Allison W. Brown, Jr., Attorney, National Labor Relations Board.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Dominick L. Manoli, Assoc. Gen. Counsel, N.L.R.B., Glen M. Bendixsen, Atty., N.L.R.B., Washington, D. C., for petitioner.

Cody Fowler, Granville M. Alley, Jr., Tampa, Fla., Glenn L. Greene, Jr., and Raymond J. Malloy, Tampa, Fla., Fowler, White, Gillen, Humkey & Trenam, Tampa, Fla., of counsel, for respondent.

Before TUTTLE, Chief Judge, and POPE * and JONES, Circuit Judges.

TUTTLE, Chief Judge.

This is a proceeding by the National Labor Relations Board seeking enforcement of its order issued against the respondent, which is a newspaper publisher in Sarasota, Florida.

The Board found that respondent violated Section 8(a) (1) of the Act by unlawfully interrogating its employees regarding their union activity, and that it violated Section 8(a) (3) and (1) by discharging employees, John A. Gulsby, Jack E. Cartlidge, and Myra Frisbie, because of their union activities. The Board further found that respondent's discharge of Gulsby was motivated, *inter alia*, by the employee's testimony in a Board proceeding, and that respondent thereby also violated Section 8(a) (4) of the Act.

There are four questions presented on the appeal. The first three are well stated by the Board in its brief:

"I. Whether substantial evidence on the whole record supports the Board's finding that respondent interrogated its employees concerning their union activity in a manner constituting interference, restraint, and coercion proscribed by Section 8(a) (1) of the Act.

"II. Whether the Board properly found that John A. Gulsby was not a supervisor and that by discharging him for union activity respondent violated Section 8(a) (3) and (1), and (4) of the Act.

"III. Whether the Board properly found that motor route carriers Cartlidge and Frisbie were not independent contractors and that by dis-

charging them for union activity respondent violated Section 8(a) (3) and (1) of the Act."

The fourth question is raised by respondent's contention that even though the Board's findings of fact and conclusions are fully supported, nevertheless the order promulgated by the Board and whose enforcement is here sought, is too broad in that the Board has ordered the respondent to cease and desist from discouraging membership not only in activities on behalf of the present union, but also "or in any other labor organization of its employees," and because it includes the language "or in any other manner discriminating in regard to hire or tenure of employment, or any other term or condition of employment." We, therefore, have the question whether the order, if justified at all, is too broad.

■ The first question deals with the primary charge of interference, restraint and coercion prohibited under Section 8 (a) (1) of the Act, predicated on the statements made to the employees by the President of respondent, and interrogation of the employees by counsel for respondent. These occurrences took place at a time when a petition for an election was pending. One of the questions to be determined by the Board was the propriety of the bargaining unit. We think the record supports the findings of the Board that Lindsay, the company president, told the employees that he had no intention of having a union, that he "would fight it in any court in the country," adding that no employee was indispensable, and that anybody could "leave." Whether or not this expressed attitude by the president of the company would be sufficient, cf. Harbison-Fisher Mfg. Co., 5th Cir., 304 F.2d 738, without more to sustain an 8(a) (1) violation need not be decided because we find that the conduct of counsel for the respondent taken in conjunction with Lindsay's statements, clearly supports the findings as to the 8(a) (1) violations.

* Of the Ninth Circuit, sitting by designation.

On several occasions two different lawyers for the company called in employees and had a court reporter present; the court reporter swore the employees to tell the truth in the same manner as if they were testifying in court. The employees were then questioned at great length about many matters dealing with their own relations with the union and with their knowledge as to the relations of others with the union. All of this testimony was taken down by the court reporter. The respondent urges that dire consequences would result if the court were to hold that the interrogations by counsel for respondent, at a time when there was a legitimate interest on the part of respondent to ascertain what testimony might be available on matters to be passed on by the Board, could be construed as coercive or otherwise illegal under Section 8(a) (1). We find no such likelihood of misunderstanding of the extent to which counsel may legitimately inquire of prospective witnesses if we determine here, as we do, that the conduct of counsel in these proceedings was clearly beyond the pale. We call attention particularly to the circumstance that employees were called into a formal proceeding where they were sworn by a court reporter, which the Board could certainly find would create the strong impression on the mind of a layman that there would be legal sanctions against the making of an incorrect or false statement, which sanctions in fact do not exist under any known Florida statute for the violation of an oath in such a proceeding as was being conducted. Thus, it is obvious that an impression of awe and inviolability surrounding the proceedings was sought to be created, which would clearly have a coercive effect. Upon oral argument counsel assured the court that this method of perpetuating testimony is customarily used by counsel in

the state of Florida. The reason given was that it does impress the prospective witness with the sanctity of his oath and the necessity for adhering strictly to the truth. If this is so, then it creates a false impression, since there is no more sanctity to a statement made by a prospective witness under an unauthorized oath of this kind than there is if he makes a statement without first being sworn. Thus, a false impression of solemnity and inviolability is sought to be created which in a sense is nothing more than an effort to "scare" a witness into telling the truth.[1] This procedure certainly falls within the condemnation of Section 8(a) (1), because it is a "method of interrogation [which] imbue[s] the interview with an unnatural formality which tends to intimidate the employee." N. L. R. B. v. Fire Door Corp., of America, 2nd Cir., 291 F.2d 328, 331. It is clear, therefore, on this record, that the conclusion of the Board that there was an 8(a) (1) violation must be sustained.

We turn next to the question whether there was substantial evidence on the record as a whole to support the Board's determination that Gulsby was not a supervisory employee. Respondent does not dispute that it discharged Gulsby because of his union activity; it contends, however, that Gulsby was a supervisor and was, therefore, not entitled to the protection of the Act. The parties are not in substantial disagreement as to the legal definition of what constitutes a supervisor. In fact the term "supervisor" is defined by Section 2(11) of the Act as: "[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if

1. Of course, nothing said here is intended to indicate that this Court does not have the greatest concern over the duty of every person to deal with the truth as a sacred thing. We do not disparage truth when we say that putting a man under oath under circumstances which do not carry any legal significance gives him a false impression that he owes not only the moral duty to tell the truth, but also that he is subject to criminal sanctions if he fails to do so. It is the creation of this false impression that we are here criticizing.

in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

■ As this Court has pointed out in Poultry Enterprises v. National Labor Relations Board, 5th Cir., 216 F.2d 798, 802:

"Although the statute states various sorts of supervisory authority coupled by the disjunctive *(or)*, it states the requirement of independence of judgment in the conjunctive (i. e., *in connection*) with what goes before."

We, therefore, look to see whether the Board's finding of fact can be supported by substantial evidence that Gulsby did not exercise any of these supervisory functions in a manner that "required the use of independent judgment." In making such determination we should bear in mind that sporadic exercise of some supervisory authority does not of itself turn an employee into a supervisor. In our opinion in Poultry Enterprises, Inc. v. N. L. R. B., supra, we quoted from the previous decision in N. L. R. B. v. Stewart, 5th Cir., 207 F.2d 8, where on page 10 we said: "Such occasional performance of supervisory duties does not make an employee a supervisor within the meaning of the Act." We consider the facts which the Examiner could properly find from the evidence touching on Gulsby's activities in order to determine whether these facts could support the conclusion that Gulsby was not a supervisor. The facts which we believe the Examiner could find on the evidence before him, and which were approved by the Board are that Gulsby was at no time told by Arn, the Circulation Manager who was his admitted boss, or any other company official that he was a supervisor or that he had any specific authority on the one night a week he was "in charge" of the mail room. Gulsby was in that position only on the day on which Linn, an admitted supervisor, was off duty. Gulsby did not have authority to hire or fire, to promote or reward employees or to lay off or recall them. The work performed in the mail room was routine in nature and each employee's job was fixed by a schedule made by others than Gulsby. The employees in the mail room generally knew their jobs and their assignments and they required little, if any, direction in the daily operations. Gulsby was not empowered to deviate from the schedule without calling Arn for authorization. Close check was kept by Arn and Linn on the work of the mail room on the night Gulsby was "in charge." Gulsby also performed all of his regular duties on the nights he was in charge. He was not paid a salary for his extra duties, but was paid on an hourly basis except that for part of the time he was given extra hours on the payroll which he may not have performed. The other employees of the mail room were never informed that Gulsby was in charge or had supervisory duties. Finally, and significantly, Arn named Parks as the afternoon, and Linn as the night supervisors and did not name Gulsby as a supervisor until after the supervisory status of Gulsby became an issue in the representation case.

■ We conclude that, under the facts which the Board could find to be true on the record before it, the Board's determination that Gulsby was not a supervisor cannot be set aside for want of factual support on the record considered as a whole. Thus it is, in light of the concession by respondent that Gulsby was fired on account of his union activity, that the Board's order requiring his reinstatement must be enforced. This conclusion, of course, supports the Board's findings that the company was guilty of 8(a)(1) and 8(a)(3) violations by reason of its treatment of Gulsby.

It makes little difference from a practical standpoint whether the Board was justified in finding that Gulsby was fired *"inter alia"* on account of his testimony at the representation hearing. In view of all of the circumstances, however, we think that the Board could fairly infer that this was one of the grounds for which he was fired.

■■ We next come to the matter of the discharge of the two motor route carriers, Cartlidge and Frisbie. The decision here, of course, depends upon whether the Board was warranted in finding that these two persons were employees as distinguished from independent contractors. Section 2(3) of the Act provides that the term "employee" shall not include "any individual having the status of independent contractor." This status of independent contractor is not defined anywhere in the Act. It, therefore, becomes necessary to look to common law concepts to determine the true status of persons who claim to be protected as employees. National Labor Relations Board v. Nu-car Carriers, Inc., C.A.3, 189 F.2d 756, cert. denied 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687. This Court has stated in N. L. R. B. v. Steinberg & Company, 5th Cir., 182 F.2d 850, at 855 that the distinction between an employee and an independent contractor under Section 2(3), " * * * is found in the nature and the amount of control reserved by the person for whom the work is done." Respondent filed 151 exceptions to findings of fact by the examiner. Approximately 90 of these relate to specific findings dealing with the method of handling the work of deliveries by Cartlidge and Frisbie and their relations with the company. Many of these exceptions are frivolous and of utterly no significance in a determination whether the Board's findings of fact were based on substantial evidence. A careful consideration of the record indicates to us that there is ample support for the Board's findings of seventeen points on which it based its conclusion that the status of Cartlidge and Frisbie was that of employee rather than independent contractor. In its 350 page brief,[2] respondent attempts at great length to attack each of the seventeen points, but in no case has it satisfied us that evidence adduced on the hearing did not warrant the findings. The seventeen points may be stated in the language used by respondent in its brief.

"1. Respondent selects and controls the scope of a motor carrier's territory.

"2. It, alone, established the price at which the papers are to be bought and sold.

"3. It assists in obtaining new subscribers.

"4. It requires that certain subscribers are serviced whether or not the carrier wishes to do so.

"5. It insists that delivery be made to paper tubes despite the carrier's objection to this method on grounds that it increased the carrier's cost of operation.

"6. It requires papers to be waxed under certain weather conditions.

"7. It requires papers to be folded in a manner indicated by the Respondent.

"8. It accepts 'returns.'

"9. It replaces a certain number of papers lost in delivery.

"10. It refuses to allow the carrier to bill his subscribers as he sees fit.

"11. It requires that a carrier make payment by depositing the amount owed the Respondent directly to the latter's bank account.

"12. It retains payments made by subscribers for more than three months in advance (thus depriving the carrier of the use of such funds.)

"13. It insists that it pass on the qualification of certain helpers or subcarriers.

"14. It has required that a carrier discharge a helper unsatisfactory to it despite the fact that the carrier did not wish to do so.

---

2. This court has no rule, as do many appellate courts, limiting the length of briefs. However, the court has the right to expect some self-imposed restraints which will normally keep briefs to manageable size.

"15. Respondent precludes its carriers from delivering any other publication.

"16. Respondent precludes its carriers from holding any other job.

"17. Respondent has terminated the relationship at its will."

Suffice it to say, even though there are some elements of the relationship that might tend to permit a finding that the motor route carriers were independent contractors, the foregoing findings of the Board clearly support its conclusion to the contrary. We find that there was ample evidence in the record to warrant the findings of fact here upon which the Board concluded that the two persons concerned were employees of the respondent.

■ We come finally to the question whether the order entered by the Labor Board is too general in its terms. As we have indicated above, we think it plain that the respondents made a genuine effort to conduct the affairs of the newspaper company in such a manner as would constitute the persons engaged as motor route carriers independent contractors rather than employees. It also appears that the respondent may well have in good faith considered that Gulsby was a supervisory employee and, therefore, not protected. The conduct of the company touching on its acts in relation with these employees, therefore, need not be indicative of its intent to continue in an intransigent attitude towards efforts by the employees to organize under the provisions of the appropriate sections of the Act. We think, therefore, that there is no justification for the cease and desist order to go beyond the actual facts of this case. There is no basis for the observation by the Trial Examiner that "The commission of similar and other unfair labor practices reasonably may be anticipated." The Board may redraft its order in accordance with what is said here. As redrafted the order will be enforced. See N. L. R. B. v. Thompson Ramo Woolridge, Inc., 7th Cir., 305 F.2d 807.