**NATIONAL LABOR RELATIONS BOARD, Petitioner**

v.

**NORTHWESTERN PUBLISHING COMPANY, Respondent.**

No. 14759.

United States Court of Appeals
Seventh Circuit.

April 1, 1965.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Richard P. Lawlor, Atty., N. L. R. B., Washington, D. C., for petitioner.

Francis E. Hickey, Rockford, Ill., Kenneth C. McGuiness, Washington, D. C., Miller, Thomas, Hickey & Collins, Rockford, Ill., Vedder, Price, Kaufman & Kammholz, Washington, D. C., Frank J. Meyer, Acton, Baldwin, Bookwalter & Meyer, Danville, Ill., for respondent.

Before KNOCH, CASTLE and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court upon the petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended (29 U.S.C.A. § 160(e)) for enforcement of the Board's order issued against Northwestern Publishing Company, the respondent. The Board's initial decision and order are reported at 144 NLRB No. 98. That decision was reaffirmed by a supplemental decision and order reported at 146 NLRB No. 69.

The Board found that the respondent company refused to bargain in good faith with the Union,[1] in violation of Section 8(a) (5) and (1) of the Act:[2] (a) by

---

1. Chauffeurs, Teamsters and Helpers, Local 26, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

2. All references herein to the "Act" are to the National Labor Relations Act, as amended. 29 U.S.C.A. § 151 et seq.

maintaining throughout the discussions with the Union the position that its newspaper distribution drivers, with respect to whom the Union had been designated the exclusive representative, were not employees; (b) by refusing to furnish the Union with requested wage information; and (c) by unilaterally instituting changes in its distribution system and in discharging 10 drivers pursuant to those changes. The Board also found that the discharges were effected for the purpose of dissipating the Union's majority, and constituted a violation of Section 8(a) (3) and (1) of the Act. The Board ordered the company to cease and desist from the unfair labor practices found, and from in any other manner, interfering with, restraining or coercing its employees in the exercise of the rights guaranteed them by Section 7 of the Act. Affirmatively, the order directs the company to reinstitute its delivery system as it existed prior to September 4, 1962, and to offer full reinstatement and backpay to the 10 drivers discharged, to bargain collectively with the Union upon request, and to furnish the Union upon request information pertaining to wages and other allowances to drivers, and to post designated notices.

The contentions advanced by the respondent company in opposition to the Board's petition for enforcement of its order precipitate the following contested issues.

(1) Whether an alleged procedural irregularity invalidated the Board's certification of the Union, the Union's status as the exclusive collective bargaining representative of the company's distribution drivers, and the Board's subsequent unfair labor practice findings and the order based thereon.

(2) Whether the Board properly held the company's newspaper distribution drivers to be employees, rather than independent contractors.

(3) Whether substantial evidence on the record considered as a whole supports the Board's findings that

the company refused to bargain in good faith with the Union and discharged 10 of its drivers in an attempt to dissipate the Union's majority.

The company contends that the Union's certification, following a hearing on the issue as to whether the company's distribution drivers are employees or independent contractors, is invalid (and the unfair labor practice findings based on the Union's status as the collective bargaining representative of such drivers are likewise invalid) because allegedly a single Board member passed upon and denied the company's request for review of the Regional Director's decision that the distribution drivers are employees. In January, 1962, the Union petitioned for an election in a unit of the company's newspaper delivery drivers. Following a hearing, the Regional Director issued a decision and direction of election finding appropriate a unit of all the company's drivers and rejecting the company's contention that the drivers are independent contractors. The company's request for review was denied by order dated May 3, 1962. On May 17, 1962, after an election, the Union was certified as the representative of the drivers. The order in the instant unfair labor practice case was issued October 14, 1963. On November 1, 1963, the company filed a motion for reconsideration alleging that its request for review of the representation election decision was denied by a single member of the Board contrary to the requirements of Sections 9 and 3(b) of the Act and therefore there is no valid basis for a conclusion that the drivers are employees and no basis for the Board's unfair 'labor practice findings and its reinstatement and bargaining order. The Board granted the motion for reconsideration, reconsidered the request for review of the representation proceeding and affirmed the prior denial thereof as well as the decision and order in the unfair labor practice case.

The company's defense based on the alleged invalidity of the Board certification is particularly unpersuasive in the

circumstances of this case. It appears to have been injected into this proceeding as an afterthought. This ground, which is now asserted as justification for a refusal to bargain, was not put forth at the time of the 1962 company-Union meetings and discussions nor mentioned during the unfair labor practice proceeding until the filing of the motion for reconsideration—some 18 months after the Union had been certified and more than a year after reports had been publicized that the Board had abandoned the practice of having one member pass on review requests.

■ Moreover, the alleged procedural infirmity, if in fact it existed, was cured by the Board's subsequent action in reconsidering the request for review of the Regional Director's determination and affirmance of that decision. N. L. R. B. v. Schill Steel Products, Inc., 5 Cir., 340 F.2d 568; Miami Newspaper Printing Pressmen's Local 46 v. McCulloch, 116 U.S.App.D.C. 243, 322 F.2d 993, 998. In the posture of this case we perceive no merit to the company's contentions based on the alleged invalidity of the Union's certification.

■ We are not impressed by the company's contention that the distribution drivers are not employees but are independent contractors. We have reviewed the record in the light of the controlling principles governing the determination of such issue as set forth in N. L. R. B. v. Phoenix Mutual Life Insurance Co., 7 Cir., 167 F.2d 983, 6 A.L.R.2d 408; United Insurance Company of America v. N. L. R. B., 7 Cir., 304 F.2d 86; N. L. R. B. v. Lindsay Newspapers, Inc., 5 Cir., 315 F.2d 709 and N. L. R. B. v. A. S. Abell Company and Hearst Consolidated Publications, Inc., 4 Cir., 327 F.2d 1. We conclude that the Board's determination of the issue is supported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456. The lack of consistency in the company's position on the issue, as evidenced by the record, indicates absence of conviction on its part

that the Board's determination was erroneous. The company did not elect to refuse to undertake bargaining negotiations with the Union and thereby directly precipitate a determination of the issue in a Board proceeding testing its obligation to bargain with the Union. Instead it proceeded to meet with the Union on some eleven occasions over a two and one-half month period—and contends before this Court that in the company-Union discussions the company representative recognized the employee status of the drivers. It would unnecessarily extend this opinion to set forth in detail the factual elements which, considered in their totality, evidence the company's right to exercise that control and direction of the drivers' activities in the performance of the work involved which establishes existence of the employer-employee relationship between the company and the drivers. Under the circumstances of this case we deem it sufficient to observe that the material factors involved are comparable to those which were present in Lindsay, supra, and the supervision which was lacking in Abell is present here.

We turn to consideration of the sufficiency of the record to support the unfair labor practice findings. The company contends that it bargained in good faith but is, in effect, being penalized for failure to concede to the Union's demands. It contends that the route consolidations and discharges it made were but the exercise of management rights to avert threatened economic loss due to the impact of unionization.

The record discloses that initially the Union's proposed collective bargaining agreement served as the basis for discussion in the meetings. The Union sought, among other things, a seniority clause, increased wages, vacations, paid holidays, health and welfare benefits, pensions, and sick leave. Sharp differences on each of these proposals soon became apparent and the company maintained that until the current written agreements with drivers were terminated and the individuals thereafter hired they

would not attain employee status furnishing a basis for seniority. All discussions relative to the application of seniority met with the same response. This underlying position—that despite the Board's determination to the contrary, the drivers were independent contractors and would not become employees until rehired as such—clearly cut off meaningful discussion on the question of seniority, a basic subject of bargaining. N. L. R. B. v. Proof Co., 7 Cir., 242 F.2d 560, 562. It was plainly inconsistent with the company's duty to bargain in good faith with the Union.

■ The company computed the total cost of the Union's economic demands as being wholly unacceptable.[3] The Union negotiator acknowledged that the Union's initial proposal was unrealistic and requested firm wage information on the drivers so that the proposal could be revised and adapted to the company's operation. Although the company furnished certain of this information it refused to supply a breakdown of the compensation of one class of its drivers between commission and automobile expense allowance paid to them. It is well settled that an employer's statutory obligation includes the duty to supply earnings information of the kind here requested. N. L. R. B. v. John S. Swift Company, Inc., 7 Cir., 277 F.2d 641, 645. And, although the information might be secured from the employees themselves, this did not relieve the company from this duty.

The eleven company-Union meetings occurred over a period of 84 days in 1962—on June 8, 12 and 22, July 3, 18, 20 and 25, and August 1, 17, 27 and 30. Before the end of June, the company mentioned the probability of its establishing a new distribution system because of the economic impact of the Union's demands. The company's drivers consist of two classes. Those known as bundle delivery drivers make deliveries to the company's

approximately 350 carrier boys in the city of Danville, Illinois, and the surrounding area. Those known as the tube drivers make delivery to individual subscribers in the more remote areas which formerly had been serviced by a predated edition delivered by mail. At the July 3, meeting the union bargaining committee was informed as to a survey the company had made of its current distribution system. The survey had concluded that the tube routes were unprofitable and recommended that some or all be returned to mail delivery. It also concluded that savings could be realized through consolidation of bundle delivery routes. The union negotiator acknowledged the possibility of a need to eliminate routes, and perhaps jobs, through consolidation but objected to the company's proposed use of district managers as bundle delivery drivers, noting the non-union status of these supervisory employees. Although there were further discussions concerning route consolidations, and the Union proposed that the choice of drivers to be retained be made on the basis of seniority in service, the company continued to maintain that the drivers would not be employees until rehired after termination of their current individual contracts and that they thus had no seniority to apply in event of consolidation. On August 17, the company presented the details of its new distribution system, indicated it would terminate those whom it wished, and select those who were to operate the new system. Under the new system the area bundle routes were to be reduced to six, and the city bundle routes to five districts, to be delivered by the district managers on 5 days each week and by swing drivers on the other two days. No change was to be made in tube driver route distribution. On August 21, the company terminated the employment of 10 bundle delivery drivers considered excess under the new system. Seven of these were known by the company to be

---

3. The drivers work part-time, approximately one to four hours a day depending on the particular route serviced, and

sometimes worked longer hours if delayed in receiving the newspapers.

Union members. On August 27, it announced the names, wages, and assignments of those, including the remaining nine bundle delivery drivers represented by the Union, who would operate the system; on August 30, it revised the wage scales upward; and on September 4, the new system and all its changes went into effect. The district managers were assigned to the city bundle delivery routes. All of these changes were unilaterally made, and although announced at the final meetings were not the product of bargaining but put into effect over the Union's protests.

The company's contention that it bargained in good faith with the Union concerning the change in its distribution system—a change which it claims was necessitated by the economic impact of the Union's demands—is not supported by the record. The abrupt and summary manner in which the change was effected, the arbitrary rejection of consideration of three proposals relating to the application of seniority on the basis that pending termination of the current individual agreements with the drivers they remained independent contractors, the refusal to supply the requested breakdown with respect to the tube drivers' compensation, and the replacement of union drivers with supervisory employees with non-union status, all serve to establish a lack of good faith bargaining on the part of the company.

The company's reliance upon Jays Foods, Inc., v. N. L. R. B., 7 Cir., 292 F. 2d 317, and the cases therein cited, is misplaced. The change in its distribution system which the company here effected is the kind of unilateral action held in Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, to violate an employer's Section 8(a)(5) obligation to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." Jays Foods involved a managerial decision lying at the core of entrepreneurial control. There the employer elected to abolish its automotive repair and maintenance department and farm out the work, and discharged its automobile mechanics, rather than bargain with the union which had won the right to represent such employees in a representation election. This Court held (292 F.2d 317, 320) such action was "simply the exercise of a right of management to avert a threatened economic loss and operate its business according to establish principles" and observed that "[a]n employer has a right to consider objectively and independently the economic impact of unionization of his shop and to manage his business accordingly." But in the instant case no discontinuance of the activity concerned, and its contracting out, are involved. As pointed out in Justice Stewart's concurring opinion in Fibreboard (379 U.S. 203, 224, 85 S.Ct. 398, 410) "all that is involved is the substitution of one group of workers for another to perform the same task * * * under the ultimate control of the same employer" and:

"The question whether the employer may discharge one group of workers and substitute another for them is closely analogous to many other situations within the traditional framework of collective bargaining. Compulsory retirement, layoffs according to seniority, assignment of work among potentially eligible groups within the plant—all involve similar questions of discharge and work assignment, and all have been recognized as subjects of compulsory collective bargaining."

Here, as in Fibreboard, the discharges resulted from the type of organizational change which effects the "condition of employment" and the company was not, as it claims, free to make such change without good faith bargaining with respect thereto. We conclude that the Board's findings of Section 8(a)(5) and (1) violations are supported by substantial evidence on the record considered as a whole and represent the application of correct legal criteria.

The Board's further finding and conclusion that the discharge of the 10

bundle delivery drivers was discriminatorily motivated and violated Section 8 (a)(3) and (1) of the Act, is equally supported in fact and in law. As hereinbefore pointed out, the company was aware of the Union adherence of seven of the drivers so discharged. Moreover, the replacement of these drivers with five district managers—conceded to be supervisory employees excluded from the bargaining unit—served to dissipate the Union's majority. In addition, an anti-union basis for the change effected in the distribution system—rather than the economic motive claimed by the company—appears from the fact that although the company's own survey concluded that the tube routes were unprofitable and recommended that some or all be returned to mail delivery, the consolidations and changes left them untouched and the impact of the reorganization of the distribution system was directed solely to the bundle delivery routes—a known source of Union strength.

Further supporting the inference drawn by the Board of unlawful motivation is the fact that the reasons given by the company for selecting the drivers it discharged are without evidentiary support. The company cited three factors claimed to have been used in making the selection—the driver's residence or home location, his capability, and his equipment. But no showing was made as to how or why the equipment of the dischargees—presumably their automobiles—failed to meet the needs of the job. Six of the terminated drivers lived in the city of Danville and presumably met the residence factor for retention on the city routes. And the 5 district managers and two other part-time employees newly assigned to the city routes had no previous experience in driving the bundle delivery routes. The discharged drivers, by contrast, had served the company as delivery drivers for periods ranging from 5 to 20 years. Absent a contrary showing it would appear that "seasoned men are better than green hands". N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 872.

The Board's petition for enforcement of its order is granted and enforcement ordered.

Enforcement ordered