Douglas **BROWN** et al., Petitioners,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,
and
San Francisco Newspaper Printing Company, Inc., Intervenor,
and
Newspaper and Periodical Drivers' & Helpers' Union Local 921, Intervenor.

No. 71–2767.

United States Court of Appeals, Ninth Circuit.

June 12, 1972.

Timothy H. Fine (argued), G. Joseph Bertain, Jr., San Francisco, Cal., for petitioners.

Joseph C. Thackery (argued), William F. Wachter, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter G. Nash, Gen. Counsel, Ogden W. Fields, Executive

Secretary, N. L. R. B., Washington, D. C., Roy O. Hoffman, Reg. Dir., Jerrold C. Schaefer, San Francisco, Cal., for respondent.

R. Barry Churton (argued), of Cooper, White & Cooper, San Francisco, Cal., Garret McEnerney, II, San Francisco, Cal., for intervenors.

Before DUNIWAY, HUFSTEDLER and CHOY, Circuit Judges.

CHOY, Circuit Judge:

## I. *Proceedings Below*

In September, 1965, the Hearst Corporation, which publishes the *San Francisco Examiner*, and the Chronicle Publishing Company, which publishes the *San Francisco Chronicle*, formed the San Francisco Newspaper Printing Company, Inc. (the Company) to operate certain business aspects of the two dailies and the *Sunday Examiner and Chronicle*. Until 1965, the Newspaper & Periodical Drivers and Helpers' Union, Local 921, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America (the Union), dealt with each newspaper individually. In 1967, the Union entered into a collective bargaining agreement with the Company, which was amended by a 1968 Supplemental Agreement.

Sections 1(a) and (b) of the Supplemental Agreement extended the Union's jurisdiction to the Company's employees in the San Francisco suburbs, and provided for the termination of contracts with individual newspaper dealers in certain areas according to a prescribed schedule. The Union's prior attempts to unionize these suburban newspaper dealers had met with little success, and the Supplemental Agreement provided, in effect, for cancellation or unionization at each dealer's option.

Thirty-seven dealers in Marin and Santa Clara counties were affected by the Supplemental Agreement. None of the dealers was covered by the union contract or the Supplemental Agreement. Five dealers (the Dealers) then filed unfair labor practice charges against the Company and the Union with the National Labor Relations Board, alleging that their prospective terminations pursuant to the Supplemental Agreement violated § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).[1] Identical charges were filed by four more dealers during June and August, 1970. The Board's Regional Counsel authorized the issuance of a complaint against the Company and the Union, and the district court entered a temporary injunction pursuant to 10(*l*).

The trial examiner held that the Dealers were "employees" rather than "independent contractors," and were thus precluded from challenging the Supplemental Agreement. The Board, one member dissenting, accepted the recommendation that the complaint be dismissed. 194 N.L.R.B. No. 4 (1971). The Dealers immediately filed for judicial review under § 10(f). The district court dissolved its injunction, and the Company terminated three more dealers. We expedited review, stayed the Board's order, and continued the restraining order until further notice. We reverse and remand for a hearing on the merits.

## II. *Major Characteristics of the Dealership Relationship*

1. The contract. The Company provides a uniform printed contract which each dealer must sign. The Company agrees to sell papers to the dealer at the wholesale rate, to assist him upon request, and to provide customer lists to the extent they are available and not al-

---

1. "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from . . . doing business with any other person, and any contract or agreement entered heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void . . . ."

Unless otherwise noted, all references shall be to the Act itself and not to 29 U.S.C. § 141 et seq.

ready furnished. It also covenants "[t]hat, notwithstanding anything to the contrary in this Agreement, it will not exercise any direction or control or right thereof over the manner, methods or means Dealer shall employ to perform this Agreement."

The dealer agrees to purchase enough papers adequately to service his customers, to post a bond, and to furnish the Company, on demand, with whatever records he keeps. He may not assign his rights under the contract. The dealer "shall not be entitled to receive any compensation, allowances or other payment from Printing Company." The Company disavows all liability for any losses, expenses, damages, or injuries incurred in the dealer's business or caused by the dealer's agents or employees. Finally, the contract recites that "Dealer is engaged in an independent business and is an independent operator, contractor, merchant and/or distributor and not an employee of Printing Company."

2. Price and territory control. The Company sets the wholesale price at which it sells papers to the dealer, who sets his own retail price. The Company suggests a retail price, to which many but not all dealers adhere. While the dealer covenants not to sell papers outside his designated territory, the Company allows dealers to exchange customers or areas along the edges of their territories.

3. Delivery. The Company delivers papers to dropoff points designated by the dealer and instructs that daily papers must be delivered to customers by 6:30 a. m., the Sunday paper by 7:30 a. m. Individual dealers insist that the papers be delivered well before this deadline. Other than the delivery deadline and a requirement that papers be protected from the weather, the Company leaves the details of delivery to the dealer, who hires carriers and determines their number, method of pay, hours and duties.

The dealer has complete authority to and does refuse to deliver to customers, especially because of defaulted payments, inaccessible homes, or impassable roads.

4. Credits and subsidies. The Company ordinarily refuses to accept returned newspapers for credit. If a dealer's draw of papers exceeds his sales, he bears the loss. However, the Company does accept returns when it unilaterally increases or "stuffs" a dealer's draw. On Sundays, the Company provides a credit for returned papers in excess of eight percent of the dealer's draw when it unilaterally stuffs the draw.

During the fifty-three day strike in 1968, the Company allowed dealers to borrow up to $400, with interest at 6% per year on the unpaid balance. After the strike the Company granted subsidies provided dealers maintained their post-strike draw at pre-strike levels. The Company occasionally lowers its wholesale rate and provides a car allowance as an incentive for dealers in less lucrative areas.

5. Billing. The Company exercises no control over the method by which a dealer bills customers. Nor does the Company assist a dealer who turns defaulted bills over to a collection agency or to small claims court. The dealer has the sole, accurate list of the Company's customers.

6. Competing jobs and papers. The Company allows dealers to take or continue outside jobs and to sell and deliver competing newspapers.

7. Supervision. The Company maintains two circulation area supervisors in the Marin area, one of whom sees his dealers once a week for twenty to thirty minutes. Less than five minutes is devoted to business. The other supervisor sees his dealers less often and maintains no fixed schedule of meetings. Neither supervisor polices delivery, and aside from occasional comments about an empty street rack he happens to notice, does not concern himself with daily delivery and service. The supervisors make suggestions about methods of billing or rack placement, but these suggestions need not be taken.

8. Dealer's investment and profit. Each dealer rents a shack or garage. Many

also maintain home business offices. They purchase newspaper racks, tying machines, recordophones, addressograph machines and plates and daily supplies, such as string, wax paper, and rubber bands from the Company or from other, less expensive sources. There is no requirement that a dealer purchase anything from the Company.

A dealer does not buy his dealership, the customer list, or good will.

A dealer's gross profit is the difference between the cost of newspapers to him and the price he sells them. Net profit is derived by deducting his costs of operation from his gross profit.

9. Complaints. The Company operates an answering service in Marin County to which every dealer must belong and contribute monthly. The service provides three copies of each customer complaint. The first goes to the dealer, who is required to collect his complaints periodically. If a complaint is "aggravated," persistent over two days, the area supervisor receives the second copy but makes no immediate effort to adjust the grievance. Instead, he inquires at his next meeting with the dealer if the complaint has been resolved. On the dealer's assurance that something has been done, the matter is closed. The third copy rests in the office files.

Customers often mail their complaints directly to the Company in San Francisco. Each complaint is referred to the dealer concerned, and the Company usually informs the customer that his dealer ". . . like all our dealers, is an independent contractor and not an employee of the company so our control over his methods of operation is somewhat limited."

## III. *Employees or Independent Contractors*

 The Act itself states that "[t]he term 'employee' . . . shall not include . . . any individual having the status of an independent contractor . . ." § 2(3). Common law agency concepts distinguish an employee from an independent contractor. NLRB v. United Insurance Company of America, 390 U.S. 254, 256, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). The application of agency principles to the facts of a case is a proper subject for judicial review, and we may affirm the Board's determination only if we can conscientiously say that it is supported by the record considered as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We cannot affirm where, as here, the Board in "[i]ts application of the law to the facts overlooked accepted principles of the law of agency and also failed to follow, distinguish, or overrule its own similar cases." Carnation Company v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970); May Department Stores Co. v. NLRB, 454 F.2d 148 (9th Cir. 1972).

Since the facts in each case are largely determinative, the Board's rulings in comparable newspaper dealer cases are not uniform. However, the standards formulated by the Board in the cases in which it found dealers to be employees [2] clearly indicate that the Dealers here are

2. The Board found newspaper dealers to be employees in Beacon Journal Publishing Co., 188 N.L.R.B. No. 23, 76 LRRM 1228 (1971); The Herald Co., 181 N.L.R.B. No. 62 (1970), enforced, 444 F.2d 430 (2nd Cir. 1971); San Antonio Light Division, The Hearst Corp., 174 N.L.R.B. 934 (1969) (*San Antonio III*); El Mundo, Inc., 167 N.L.R.B. 760 (1967); News Syndicate Co., Inc., 164 N.L.R.B. 422 (1967); San Antonio II, 167 N.L.R.B. 689 (1967); Brush-Moore Newspapers, Inc., 161 N.L.R.B. 1620 (1966), enforced, 413 F.2d 809 (6th Cir., 1969); The Sacramento Union, 160 N.L.R.B. 1515 (1966); Eureka Newspapers, Inc., 154 N.L.R.B. 1181 (1965); The Vindicator Printing Co., 146 N.L.R.B. 871 (1964); A. S. Abell Co., 137 N.L.R.B. 238 (1962), enforcement denied, 327 F.2d 1 (4th Cir. 1964); San Antonio I, 130 N.L.R.B. 619 (1961); Lindsay Newspapers, Inc., 130 N.L.R.B. 680 (1961), enforced as modified, 315 F.2d 709 (5th Cir. 1963); Buffalo Courier-Express, Inc., 129 N.L.R.B. 932 (1960); and P. G. Publishing Co., 114 N.L.R.B. 60 (1955).

independent contractors rather than employees.[3] The Board previously has emphasized three factors, each including various factual considerations: (1) the entrepreneurial aspects of the dealer's business, including the "right to control," (2) the risk of loss and opportunity for profit, and (3) the dealer's proprietory interest in his dealership.[4] An analysis of this case in terms of these factors compels us to conclude that the Dealers are equivalent to "the independent businessman whose earnings are controlled by self-determined policies, personal investment, and expenditure, and market conditions." Beacon Journal Publishing Co., 188 N.L.R.B. No. 23, 76 LRRM 1228, 1230 (1971).

A caveat is necessary. Many characteristics of the relationship between the Company and the Dealers are compatible with an employment, independent contractor, or franchise relationship. "Evidence of economic control is not necessarily proof of the kind of control that is relevant to a decision whether a person is a contractor or an employee." *Carnation Company, supra,* 429 F.2d at 1134. Great importance may not be attached to the fact, as the trial examiner put it, that "[t]he result to be accomplished is, of course, the circulation and sale of the Company's newspapers." Both the Company and the Dealers benefit from increased circulation and sales. The rapid adjustment of complaints and a desire to promote sales are mutual goals, whether the Dealers are employees, independent contractors, or franchisees. It is immaterial to the present inquiry that the Company wishes complaints to be adjusted or sales promoted. The means used and the respective controls in accomplishing these goals are, however, highly material to the ultimate determination of employee or contractor status.

1. Entrepreneurial aspects. The various entrepreneurial characteristics of the Dealer's operations and the lack of control which the Company exercises require a finding that the Dealers are independent contractors.

First, until this dispute arose, the Company itself considered the Dealers to be independent contractors. Its uniform contract specifically disavows any intention to control the details of the distribution process. It attempts to insulate the Company from any liability arising from the Dealer's operations, and explicitly defines the relationship it creates as that of independent contractor. Moreover, the Company represents to its complaining customers that its hands are tied because the Dealers are independent businessmen. The contract, while not conclusive, is an important indication of the parties' conception of their relationship. And here, the Company has, in fact, insulated itself from tort liability. The occasional paper which finds its way through a picture window is entirely the dealer's responsibility.

Next, aside from the admonitions that the papers be dry and promptly delivered, precautions which the Dealers' self-inter-

---

3. The Board found newspaper dealers to be independent contractors in Stockton Daily Record, 71 LRRM 1613 (Reg.Dir., 20th Reg., 1969); The Pulitzer Publishing Co., 146 N.L.R.B. 302 (1964); Carter Publications, Inc., 100 N.L.R.B. 599 (1952); The Times Herald Printing Co., 94 N.L.R.B. 1785 (1951); and The Kansas City Star, Co., 76 N.L.R.B. 384, (1948).

4. Language identical or substantially identical to the following may be found in the trial examiner's decision in this case and in almost every Board decision.
"The result to be accomplished is, of course, the circulation and sale of the Employer's newspapers. In accomplishing this result, the dealers herein bear slight resemblance to the independent businessman whose earnings are controlled by self-determined policies and personal investment . . .
"Moreover, the dealers' risk of loss and capacity to draw upon personal initiative to increase their earnings are minimized to a significant extent by the Employer's practices and policies . .
"Further, the dealers have no proprietory interest in their routes . . ."
El Mundo, Inc., 167 N.L.R.B. 760, 761 (1967).

est compels, the Company maintains no control over the manner and means of distribution. The Dealers are free to deliver the papers however they please. After the papers are brought to dropoff points designated by the Dealers,[5] the Company is unconcerned with how delivery is made. Its supervisors do not police the carriers; they have no idea who the carriers are. The weekly meetings between supervisors and dealers are perfunctory and overwhelmingly devoted to social amenities rather than to business.[6]

The Company's interest in customer complaints is equally superficial. Despite the elaborate ritual of reporting complaints in triplicate and of keeping useless logs and tally sheets, the Company actually leaves the adjustment of complaints, including "aggravated complaints," entirely in the Dealers' hands.

In addition, the Dealers possess the unquestioned power to refuse to deliver to any customer they choose. Having placed great weight upon this element in previous cases,[7] the Board cannot ignore it here. Finally, the Company allows the Dealers to take other jobs and to sell competing newspapers, factors which the Board previously emphasized but ignored in this case.[8]

2. Risk of loss and opportunity for profit. The risk of loss rests almost entirely upon the Dealers. They bear the loss of damaged, lost, or stolen papers, are liable for broken windows, and suffer financially when a customer defaults on his bills. The dealer provides the sole investment for material, racks, and machines.

The Board has previously emphasized that employee-dealers may return unsold newspapers for credit. The Dealers here may do so only when the Company unilaterally increases their draw. The Sunday credit is conditional and limited. If the dealer over- or under-estimates his needs, he bears the consequences. The so-called strike subsidy was paid only after the strike terminated, and served to maintain newspaper circulation, not to assist dealers during the period in which they had no income. Similarly, the lower wholesale paper rate and car allowance are available only in hardship areas.

The Company does provide free promotional aids. However, the dealers need not take advantage of these aids. While the sample newspapers are free, the dealer must distribute them at his own cost. While telephone and personal solicitors are paid by the Company, a dealer may bar solicitation in certain areas of his territory, and refuse to service any new customer thus acquired.

The placement and expansion of a dealer's system of street racks are on his own initiative. The dealer alone adjusts complaints. The continued patronage of his

---

5. Supervised dropoffs at points designated by the company were considered important in *San Antonio III, El Mundo, Vindicator Printing* and *Brush-Moore.* The Board ignored this factor here.

6. The lax supervision offered by the Company is comparable to the independent contractor cases of *Stockton, Pulitzer, Abell,* and *The Kansas City Star.* The control the Company exercises does not approach the daily policing of racks and deliveries in the employee cases of *Herald, San Antonio III, El Mundo,* and *Beacon Journal,* or the frequent dealer reports found in *San Antonio I and II* and *Vindicator Printing.*

7. *See, e. g., Brush-Moore, Beacon Journal, San Antonio I, Buffalo Courier-Express,* and *Eureka,* where the dealer-employees had to deliver to all customers, and *Carter, Abell, Stockton,* and *Pulitzer,* where the independent contractor-dealers had discretion to terminate customers and to refuse to deliver.

8. The employees in *El Mundo, San Antonio I, Sacramento Union, Lindsay,* and *Brush-Moore* could not moonlight. The independent contractors in *Stockton* and *Abell* could. Nor could the employees in in *El Mundo, News Syndicate, San Antonio I, Sacramento Union, Eureka, Lindsay,* and *Brush-Moore* sell competing papers. The Dealers here are free to do both.

home customers rests upon his own efforts, not upon any assistance from the Company. While the Company may increase a draw to benefit from a major news story, the dealer is responsible for producing maximum sales within his territory.

Finally, the dealer himself determines his retail price,[9] making adjustments at his sole discretion for paperboys outside churches, handicapped vendors in bus depots, and volume sellers.

Thus, the Dealers' opportunities for profit are limited only by their own initiative and policies. The essential business decisions are made by the Dealers, not by the Company.

3. Proprietory interest. The Board concluded that the Dealers lacked a proprietory interest in their dealerships since they do not purchase good will or customer lists when they begin business and may not assign their dealership. It ignored the personal investment each dealer makes in his dealership. All the Dealers own cars which are used in delivery. Many have purchased office machines for billing or tying machines for packaging. While the monetary outlay may be modest to some, an investment of more than a thousand dollars is a substantial outlay for these men.

Assuming *arguendo* that the Board is correct in concluding that the Dealers lack a proprietory interest in their dealerships, this factor is completely outweighed by the entrepreneurial aspects, risks of loss, and opportunities for profit discussed above. In sum, the Board's own decisions dictate the conclusion that the Dealers are independent businessmen.

While this newspaper case is one of first impression in this circuit, we have been guided in other employee-independent contractor cases by the Restatement of Agency 2d § 220(2).[10] *See, e. g., The Carnation Company, supra*; Associated Independent Owner-Operators, Inc. v. NLRB, 407 F.2d 1383, 1385 (9th Cir. 1969). A comparison of the factors here with the criteria of § 220(2) reenforces our conclusion that the Dealers are independent contractors.

In NLRB v. Lindsay Newspapers, Inc., 315 F.2d 709 (5th Cir. 1963), the court listed seventeen factors which supported the Board's conclusion of employee status. Ten of the seventeen *Lindsay* factors were absent in NLRB v. A. S. Abell Co., 327 F.2d 1 (4th Cir. 1964), and the court declined to enforce the Board's employee finding. Only four of the seventeen *Lindsay* factors are present here (#1, 3, 6, and 17); and as in *Abell*, the Dealer makes essential business decisions.

---

9. Even if the Company's decision to surrender the power to set retail prices resulted from Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), the Board has always considered this power highly indicative of employee status, and all its employee-dealers lacked this power. The independent contractors in *Stockton* and *Pulitzer* did not.

10. § 220(2) "In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
 "(a) the extent of control which, by the agreement, the master may exercise over the details of the work;
 "(b) whether or not the one employed is engaged in a distinct occupation or business;
 "(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 "(d) the skill required in the particular operation;
 "(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
 "(f) the length of time for which the person is employed;
 "(g) the method of payment, whether by the time or by the job;
 "(h) whether or not the work is a part of the regular business of the employer;
 "(i) whether or not the parties believe they are creating the relation of master and servant; and
 "(j) whether the principal is or is not in business."

In addition, those cases which agree with the Board's finding of employee status emphasize factors absent here. The court in Herald Co. v. NLRB, 444 F.2d 430 (2nd Cir. 1971), noted that the record disclosed the company's substantial control over the dealer's immediate income and the ultimate value of his distributorship, plus extensive policing of delivery and compulsory participation in promotions. In NLRB v. Brush-Moore Newspapers, Inc., 413 F.2d 809 (6th Cir. 1969), the court found that the dealers could not hold outside jobs or sell competing papers. The company exercised extensive control over the manner and means of delivery, and reduced the dealer's risks of loss through subsidies, mileage refunds, price variances, and credits for returns. In both these cases, control over the details of the distributorship were clearly in the newspaper's hands.

## IV. *Conclusion*

We cannot conscientiously say that the Board was correct in finding the Dealers were employees. We hold that they are independent contractors. Therefore, we reverse and remand.