**ACME INDUSTRIAL CO., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 15045.

United States Court of Appeals Seventh Circuit.

Oct. 6, 1965.

E. Allen Kovar, Charles J. Griffin, Jr., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before DUFFY, CASTLE and MAJOR, Circuit Judges.

CASTLE, Circuit Judge.

This case is before the Court upon the petition of Acme Industrial Company to review and set aside, and upon the cross-petition of the National Labor Relations Board to enforce, an order of the Board issued against the Company. The Board's decision and order are reported at 150 NLRB No. 144.

The Board found that the Company violated Section 8(a) (5) and (1) of the National Labor Relations Act, as amended, by failing to comply with the Union's [1] request for information regarding the removal of machinery from the Company's Chicago, Laflin Street, plant. The Board's order requires the Company to cease and desist from refusing to bargain with the Union by refusing to furnish it with information concerning the removal of equipment and machinery from the plant; or from in any like or related manner infringing on its employees' Section 7 rights. Affirmatively, the Company is required, upon request, to furnish the Union information concerning the removal of equipment and machinery from its plant, and to post designated notices.

The Company and the Union were parties to a collective bargaining agreement which expired on June 30, 1962. In October 1962, the Company employees represented by the Union went out on a strike which terminated with execution of a new agreement in April 1963. Although the Company operates several plants, the new agreement applied solely to its Laflin Street plant in Chicago, Illinois. At the time of the strike, about 190 employees comprised the plant bargaining unit. Immediately after the Company resumed operations following the strike, a number of employees were laid off. Between April 1963 and the date of the unfair labor practice hearing in late August 1964, the number of employees on layoff status ranged between 30 and more than 75. During this period, the status of between 7 and 9 employees was changed from layoff to termination under provisions of the agreement that continuous layoff for given periods effected a loss of seniority.

The 1963 collective bargaining agreement included a no-strike clause, a grievance and arbitration clause embracing "a difference of opinion with respect to the meaning and application of the terms of this agreement", and subcontracting and work transfer clauses containing the following provisions:

Article 1.

Section 3. It is the Company's general policy not to subcontract work which is normally performed by employees in the bargaining unit where this will cause the layoff of

1. Amalgamated Local Union No. 310, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL-CIO.

employees or prevent the recall of employees who would normally perform this work for the Company * * *.

### Article VI

Section 10. In the event the equipment of the plant or of any department, entirely or partially, is hereafter moved to another location of the Company, employees working in the plant or in such department who are subject to reduction in classification or layoff as a result thereof may transfer to the new location with full rights and seniority, unless there is then in existence at the new location a collective bargaining agreement covering production and maintenance employees at such location.

On or about January 8, 1964, the Union, upon discovering that machinery was being removed from the Laflin Street plant, began to seek information concerning this through inquiry by its stewards. The steward in each of the several instances involved asked why the machinery was being removed and where it was being moved. Company representatives answered that no violation of the contract was involved and refused to give the information. The Union submitted 11 grievances concerning removal of machinery and the subcontracting of work.

On April 3, 1964, the president of the Union wrote a letter to the Company requesting information concerning the approximate date when each piece of equipment was moved out of the plant; the place to which the equipment was moved and whether such place is a facility which is operated or controlled by the Company; the number of machines or equipment moved out of the plant; the reason or purpose for moving the equipment; and whether the equipment is used for production elsewhere. The Company refused to furnish the information requested,

All of the 11 grievances were still pending at the time of the August 1964 hearing on the unfair labor practice charge. The Board found that the information requested was "necessary in order to enable the Union to evaluate intelligently the grievances filed and to determine whether such grievances were meritorious, and whether to press for arbitration". The Board reasoned that the denial of the information deprives the Union of an opportunity to know whether jobs and machinery had been moved out of the plant under circumstances entitling employees, especially those in layoff status, to follow the jobs or entitling the Union to grieve over improper subcontracting. The Board concluded that the Company was under a statutory duty to furnish the information for the reason that by virtue of the provisions of Section 8(a) (5) and (1) and 8(d) of the Act an employer is under a statutory duty to furnish his employees' bargaining representative information which is relevant to a grievance or to the administration or policing of the contract.

But, apart from provisions such as the subcontracting and work transfer clauses of the agreement here involved it is not apparent that the removal of machinery from an employer's plant would have relevance to a possible grievance or to contract administration or policing. The nature of the subject is such that it neither necessarily nor presumptively relates to wages, hours, or other terms or conditions of employment. Moreover, the agreement provided that differences with respect to the meaning or application of the provisions concerning the contracting out of work and work transfers are subject to final and binding compulsory arbitration. And the grievance procedures prerequisite to arbitration had been invoked and were pending. The factors bearing on a determination of the relevancy of the information requested are interrelated with a construction and application of the contract provisions. The latter is a matter exclusively reserved for the arbitrator. Under the circumstances here presented Board intervention to make the determination of relevancy in the light of its

independent interpretation of the meaning and application of the contract provisions contravenes the policy expressed in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409, concerning the priority which should be accorded the grievance and arbitration procedures and machinery provided for in the contract. It was there pointed out (363 U.S. 581) that the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government and constitutes a part of the continuous collective bargaining process.

■ The arbitrator may require that he be furnished with information relevant to the resolution of the difference submitted. Under the rationale of United Steelworkers, supra, recourse to the Board under such circumstances as are here presented appears to constitute a refusal to participate in the continued collective bargaining process afforded by the grievance and arbitration procedures prescribed. In any event, enforcement of the Board's order in the posture of this case would in our judgment contravene the national policy embodied in Section 203(d) of the Labor Management Relations Act (29 U.S.C.A. § 173) that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement". And, "[t]hat policy can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play". United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 566, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403. Courts "have no business * * * determining whether there is particular language in the written instrument which will support the claim" (ibid., 568, 80 S.Ct. 1346). The declared statutory policy, and the judicial admonitions addressed to the courts, are equally applicable to the Board. Where

the determination of the relevancy of information necessarily involves factors interrelated with or dependent upon construction of the substantive provisions of the labor agreement, and those provisions are the bases of pending grievances already submitted under the grievance and arbitration procedures of the agreement, Board intervention in the guise of determining and enforcing the peripheral matter of the duty to furnish information requested contributes nothing to any objective of the Act and in our opinion is improper. The order clashes with the policy of effectual achievement of contractual arbitration.

The Board's order is set aside and its enforcement is denied.

Order set aside and enforcement denied.