**TEXACO, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 16779.

United States Court of Appeals
Seventh Circuit.

Feb. 24, 1969.

Rehearing Denied March 14, 1969.

John L. Rosshirt, Chicago, Ill., J. M. Mitchell, New York City, Owen Fairweather, Melvin L. Rosenbloom, Chicago, Ill., John T. Van Aken, R. Theodore Clark, Jr., Chicago, Ill., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., of counsel, for petitioner.

Marcel Mallet-Prevost, Asst. General Counsel, Ian Lanoff, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Allison W. Brown, Jr., John E. Nevins, Attys., N. L. R. B., for respondent.

Before HASTINGS, Senior Circuit Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

The question here is whether the National Labor Relations Board is entitled to enforcement of an order requiring Texaco, Inc. to furnish certain information to Lockport Local 7–222, Oil, Chemical and Atomic Workers International Union, AFL–CIO. Our conclusion is that the Board properly found that Texaco violated Section 8(a) (5) and (1) of the National Labor Relations Act (29 U.S.C. § 158(a) (5) and (1))[1] and that the Board's order is an appropriate remedy.

In Lockport, Illinois, plaintiff operates a petroleum refinery whose employees are represented by this Union. Both collective bargaining agreements governing the applicable years have provided for regular monthly meetings between representatives of Texaco and the Union for the consideration of matters of mutual interest.

In January 1961, Texaco instituted a continuing study and survey of its Lockport departments and units. This study was aimed at improving the economy and efficiency of the Lockport operation. It was known as the Texaco Expense Reduction Program ("TERP") and contemplated possible manpower revisions.

In June and July 1964, pursuant to this Program, a management team studied the Light Hydrocarbon Department, and later that same year a similar study was made of the Fluid Catalytic Cracking Unit.

At the regular monthly meeting in January 1966, Texaco advised the Union that effective March 7, 1966, it was eliminating the Gas Plant Helper classification in the Light Hydrocarbon Department, thus "reducing" the four junior workers in that classification.[2] Thereafter the duties of Gas Plant Help-

---

1. Section 8(a) (5) makes it an unfair labor practice for an employer to refuse to bargain collectively with its employees' representatives, and Section 8(a) (1) forbids an employer to interfere with its employees' exercise of the rights guaranteed to them by Section 7 (29 U.S.C. § 157).

2. There were no layoffs. These four employees exercised their seniority in securing other Texaco jobs, but the reductions caused them to lose some seniority rights. The change resulted in the reduction of the operating crew by one employee per shift.

ers were to be performed by three controlmen. At the March 1966 meeting, the Union stated that the elimination of the Gas Plant Helper job was unwarranted. At the next meeting, claiming that safe operations in the area had been jeopardized, the Union expressed its desire for reinstatement of the helper classification. To enable it to give "intelligent further study" to the reductions, the Union then requested "all of the time study data" the Company used in deciding to eliminate the Gas Plant Helper classification, including:

"(1) Records, studies, surveys, study manuals, instructions and procedures used in making the time studies of the jobs in the areas affected by this Helper classification reduction including full information as to the weight given to each factor used to arrive at a final decision or reduction of classifications and the factors considered in making such decisions.

"(2) All other relevant and available information, reports, studies, surveys, manuals, directives or documents pertaining to this Gas Plant Helper classification reduction."

At the July 20, 1966, meeting, Texaco gave the Union a 1964 tabulation showing the then present and recommended utilization of time for five job classifications in the Light Hydrocarbon Department and showing the number of then present and recommended employees. This tabulation called for the "reduction" of four helper employees that was put into effect in March 1966.

In discussing this same subject at the September 1966 meeting, the Union stated that it needed more information on the "factors and weights" considered by Texaco in its study, including "a detailed description of the various observation categories involved in the breakdown of the work time."

At the October 1966 meeting, Texaco answered five questions raised by the Union at the previous meeting, and stated that the units of the Light Hydrocarbon Department were being safely and efficiently operated and that the Union had already been given all the pertinent information.[3] Although Texaco furnished certain additional information at the next two meetings, the Union continued to advise that it needed more. At the last meeting before the Union lodged a complaint with the Labor Board, it requested the "general ground rules" of the TERP study and said the tabulation percentage figures presented by Texaco were not significant "without such additional information as when the observations were made, the unit conditions, the weather conditions, the amount of safety preparation, the experience of the operator, etc." Texaco replied that it had already given the Union all information which was of legitimate interest, and the Union thereupon notified Texaco that it would seek relief from the Labor Board.

As to the Fluid Catalytic Cracking Unit, Texaco eliminated the classification of Helper—Blower & Furnace on October 10, 1966, thus reducing the four junior employees in that classification.[4] Additional duties were imposed on other employees in that unit. The discussions at the monthly meetings paralleled those with respect to the Light Hydrocarbon Department and resulted in the same requests and declinations with respect to the background information sought by the Union. However, Texaco did furnish information comparable to what it supplied as to the Light Hydrocarbon Department.

After a hearing in Chicago, the Trial Examiner refused to order Texaco to give the Union the bulk of the data requested because it "dealt with purely management problems" and was not rele-

---

3. Texaco's refusal at this meeting to give any additional information to the Union formed the basis for the Trial Examiner's conclusion that the refusal to bargain commenced on October 11, 1966. The use of October 11, 1967, in his Conclusion 4, was concededly inadvertent.

4. See note 2 *supra*.

vant or necessary for performance of the Union's duties under the collective bargaining contract. However, he concluded that Texaco should furnish the Union details and basic data from its 1964 TERP studies of these two departments, "containing exact dates and work shifts when such studies were made, the names of workers therein observed, exact conditions of such workers if other than normal, the weather and unit operating conditions at time of the studies, the data, instructions, and procedures from TERP manuals, and other instructions or procedures used by TERP teams in such studies which specified their manner of observation and consideration of physical and operating conditions, and the safety, efficiency, and personnel conditions and factors to be considered in making the studies, and the actual weight and importance given by Respondent to any or all such conditions and factors in making manpower revisions on the basis of such studies."

Instead of being required to furnish all the data requested by the Union, Texaco was only required to select the foregoing materials, with the manner and form of disclosure of information "left to the good faith and common sense of the parties at the bargaining table during the regular meeting procedure or under the grievance procedure" specified in the collective bargaining contract. The Labor Board adopted the Trial Examiner's recommended order as its own, and Texaco thereupon petitioned this Court to set it aside, while the Board cross-petitioned for enforcement. Since Texaco was largely successful in opposing the Union's requests on the administrative level, the remaining issue is something of a tempest in a teapot and merits little further consideration. Texaco's brief admits that this material is "arguably relevant" to the Union's interest. This echoes the testimony of its supervisor of employee relations that he would have supplied this information to the Union if it had been specifically requested.

Ever since National Labor Relations Board v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, it has been settled that unions are entitled to company data that is relevant to the bargaining process, and that a failure to provide such data violates the Act. If the desired information is relevant and "would be of use to the union in carrying out its statutory duties and responsibilities," it must be furnished. National Labor Relations Board v. Acme Industrial Co., 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495. Of course, matters of concern solely to management need not be produced (cf. J. I. Case Co. v. National Labor Relations Board, 253 F.2d 149, 153, 155 (7th Cir. 1958)), but what the Examiner ordered Texaco to produce relates to matters of legitimate concern to this Union, namely, the safety of its members and the effect of the increased work-loads placed upon them by the job revisions. All of the matters covered by this order bear on working conditions, and their production is amply justified by precedent. Our study of this record convinces us that Texaco did not provide the Union with all relevant and needed information concerning the changes made in the Light Hydrocarbon Department and the Fluid Catalytic Cracking Unit.

The Union did not rest on its initial broad request but later pinpointed its need for materials concerning the change in operating conditions. Moreover, Texaco did not refuse information on the ground of overbreadth but rather on the ground that all pertinent data had been turned over to the Union. In our view, such an excuse cannot be deemed in good faith, particularly since the relevance of the material sought was self-evident. See Curtiss-Wright Corp. v. National Labor Relations Board, 347 F.2d 61, 65 (3d Cir. 1965); Taylor Forge & Pipe Works v. National Labor Relations Board, 234 F.2d 227, 231 (7th Cir. 1956), certiorari denied, 352 U.S. 942, 77 S.Ct. 265, 1 L.Ed.2d 238. Even if the Union's original request was somewhat "shotgun," it was so narrowed by

the Union and Trial Examiner that Texaco clearly knew what was to be furnished and could cull it from the material withheld from the Union by the Board's ruling. Texaco contends that the Trial Examiner ruled information on the manner in which Texaco carried on its 1964 study to be irrelevant and that he could not thereafter order Texaco to produce this same information. The record reveals that the Examiner prevented counsel for the Labor Board from eliciting from a company witness the very information sought by the Union and which formed the basis of its unfair labor practice charge. This limitation on cross-examination was not a determination of the question of the relevancy of the information sought to the Union's role as statutory bargaining representative, and surely it did not preclude the Trial Examiner from fashioning appropriate relief at the conclusion of this proceeding.

Relying upon American Cyanamid Co., 129 NLRB 683 (1960), Texaco claims that it was entitled to refuse the Union's mixed request covering both relevant and irrelevant, privileged information. There the union demanded "exact copies" of the company's job evaluation and description records even though they contained irrelevant, confidential information. Here there was no such adamant demand. As with the other TERP information it made available to the Union, Texaco could have supplied the remaining relevant information without turning over documents containing matters of no proper concern to the Union.

Texaco also relies upon Kroger Co. v. National Labor Relations Board, 399 F.2d 455, 457, 459 (6th Cir. 1968), but there enforcement was denied because of the "excessive breadth" of the Board's order requiring disclosure "whether or not the information had any direct relationship to the union's collective bargaining interests." Here the Trial Examiner recognized and adequately protected the conflicting interests of the parties, thus justifying a departure from Kroger.

■ Texaco argues that this request covers 1964 studies and is too stale to be of any use to the Union. But the technological changes and job revisions effected by management were largely based on the 1964 studies, and the Union should not be prevented by this fait accompli from determining whether 1964 conditions justified the unilaterally imposed changes effected in 1966. As to Texaco's contention that it should not have to supply some of this information to the Union because it is within the knowledge of the employees involved, this Court rejected a similar defense in National Labor Relations Board v. Northwestern Publishing Co., 343 F.2d 521, 525 (7th Cir. 1965), and we adhere to that ruling.

■ Finally, Texaco contends that the Union waived its right to this information in view of certain provisions of the collective bargaining agreement. One such provision permits an employee or his union to complain of unreasonably hazardous conditions to the plant manager or his representative. Here the Union was exploring the safety aspects of the revisions and was not presenting an individual employee's grievance. However, the two matters are not mutually exclusive. Cf. National Labor Relations Board v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565. For waiver, Texaco also relies on another provision that job content revisions may be established by the company after consulting the Union. Here too we find no relinquishment of the Union's right to information with respect to revisions in job content. Rather, these contract provisions emphasize the Union's duty to consult with Texaco concerning unreasonably hazardous conditions and revisions in job content. This duty cannot be properly fulfilled without access to the information used in effecting the changes.

We have considered other arguments Texaco raises in favor of setting aside the Board's order but deem them unmeritorious. Accordingly, the Board's order will be enforced in full.