P. R. MALLORY & COMPANY, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16906.

United States Court of Appeals Seventh Circuit.

June 3, 1969.

Rehearing Denied July 15, 1969.

Frederic D. Anderson, Herbert C. Snyder, Jr., Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., for petitioner.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas Silfen, Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Michael N. Sohn, John E. Nevins, Attys., N. L. R. B., Washington, D. C., for respondent.

Before CASTLE, Chief Judge, FAIRCHILD, Circuit Judge, and HOFFMAN, District Judge.[1]

HOFFMAN, District Judge.

P. R. Mallory & Company has petitioned this Court to review and set aside an order of the National Labor Relations Board directing the Company to furnish information concerning the structure and operation of its incentive wage system to the union[2] representing the Company's employees. The Board's order, reported as 171 NLRB No. 68, finds that the Company's refusal to supply this information upon the union's request constituted the unfair labor practice of refusal to bargain, in violation of Section 8(a) (5) and (1) of the Labor Management Relations Act, 29 U.S.C. Sec. 158 (a) (5) and (1), and requires the Company to cease and desist from this practice and to publish a prescribed notice to its employees. The Board has cross-petitioned for enforcement of its order.

At issue is the authority of the Board, under the statutory scheme to intervene in a dispute arising under an existing collective bargaining contract, to facilitate the resolution of the dispute through the grievance procedures provided by the contract. The Company takes the position that it owes no duty to participate in the agreed grievance procedures when, in its view, no valid grievance has been presented. Since the interpretation and enforcement of collective bargaining contracts is not vested in the Board, but is left to the ordinary processes of law, the Company insists that it need not provide information relevant to a claimed grievance until a court has first decided that a legitimate grievance has been stated. We find this position to be untenable, and conclude that the Board's order should be enforced.

## I.

Under the rule of Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1950), this Court must accept administrative findings of fact which are supported by substantial evidence. On the basis of such substantial evidence, presented at the hearing on the unfair labor practice charge, the Trial Examiner found that the Company and the union, as the duly designated bargaining agent, had entered into a series of collective bargaining contracts, the latest on October 1, 1966. That contract, for a three-year term, sets up a grievance procedure consisting of four internal steps, involving discussions between union and management representatives at ascending levels of authority, and culminating in binding arbitration as a fifth step. The contract defines a grievance as any dispute regarding the Company's interpretation or application of the collective bargaining agreement.

On the subject of wages, the agreement provides two systems for determining rates of pay. Employees in some designated positions are paid a fixed hourly rate. Employees in other classifications are compensated under an incentive plan, with a basic hourly rate and added earnings measured by productivity. The base incentive rate is set somewhat below the fixed hourly rate for comparable nonincentive classifications, in the expectation that an average ex-

1. Judge Hoffman is sitting by designation from the United States District Court for the Northern District of Illinois.

2. Local 1001, International Union of Electrical, Radio and Machine Workers, AFL–CIO.

perienced employee, working with good skill and effort in incentive operations, will earn 25% above the base incentive rate. Not all the work performed by employees in incentive classifications carries the incentive premium, however. The availability of incentive work, therefore, is an important factor determining the actual compensation of employees in the incentive classification. Concerning this factor, the agreement provides in Paragraph 44, sections (c) and (d), that:

(c) The Company will make every effort to have its employees work on incentive jobs as continuously as possible. The Company will also strive to arrange work schedules and personnel so as to maintain earnings on as high level as possible. Continuous incentive work, or noninterference with incentive earnings cannot, however, be guaranteed.

(d) No limit will be placed on the earnings of any person or group working on a regular production job under the incentive plan. Earnings of employees working on inspection, or special or critical jobs, may be limited to 25% premium. It is expected that earnings of individuals and groups may vary considerably, dependent upon experience, skill, ability, and other conditions. Quality of work, however, must at all times remain within acceptable limits.

The contract of October 1, 1966, in assigning employees to incentive or nonincentive classifications, placed the operators of turret lathes manufactured by the Warner & Swasey Company under the incentive plan. These Swasey operators were dissatisfied with this placement, however, and complained to their union representatives. In response, the union obtained from the Company on October 13, 1966, a chart showing the percentage of his total weekly hours which each of these employees spent on lucrative work, the percentage increase in earnings over the base rate for each employee, and the average percentages of incentive work and of increased earnings over the base rate for all the Swasey operators as a group.

Still dissatisfied, one of these Swasey operators filed, on October 24, 1966, a formal grievance on behalf of himself and eight other employees in the same classification. In accordance with the contract, the grievance was presented in writing on a form provided by the Company. Under the heading "Claim violation of clause", the writing refers to Paragraph 44, sections (c) and (d), of the contract, wherein the Company agreed to "make every effort" to make incentive work available. Under the heading "Nature of Grievance", the employees stated:

We feel we should be placed in * * non-incentive [category] because of the reasons below:

#1. The incentive jobs we get are of such quantity that we cannot have enough time on incentive to make any money.

#2. The amount of time spent on jobs that have not been placed on incentive plus set-up time brings our earnings down below what we could make if the incentive work was available. The average time we spend on incentive averages 21%. Therefore we feel our request is reasonable.

In subsequent oral statements of this grievance, in succeeding steps, the union representative reiterated the claim that the Company had been violating the cited paragraphs by not giving the Swasey operators as much incentive work as it could, and objected that incentive jobs were being diverted to other employees who operated automatic lathes, and that set-up time was not included in the time subject to the incentive premium. In response at each of these stages of the grievance proceedings, the Company took the position that there had been no violation of the cited paragraphs of the contract. Assurances were given, however, that every effort would be made to put as many jobs as possible on incentive for the grievants, and that their earnings in the future would probably exceed the

earnings of employees in nonincentive classifications.

In the course of these grievance meetings, the union representatives requested the Company to supply information on the operations of the incentive plan under the new contract, to bring up to date the data furnished by the Company on October 13, 1966. In particular, the union asked how many jobs had been added to the Swasey operators' incentive operations, the amount of increase in their hourly earnings, the fluctuations in their earnings above 21% of their base rate, and their actual incentive earnings since the new contract took effect. The Company took the request under advisement, but ultimately declined to supply the information or to take any further action, asserting that there was no grievance since the Company had not violated the contract, and since the Swasey operators were placed under the incentive plan by the terms of the contract. Under the agreement, a request to alter the contract did not constitute a dispute subject to grievance procedures. Viewing the union's claim as an attempt to change the contract, to transfer the Swasey operators to a nonincentive classification, the Company also declined to submit the alleged grievance to arbitration upon the union's demand.

Upon these findings, the Trial Examiner recommended dismissal of the charge, concluding that a transfer of classification could not, under the terms of the contract, be directed by an arbitrator as a remedy for a grievance, and that the information sought was in some aspects more relevant to a change in the contract than to a violation. In this view, the employees' complaint did not constitute a "real" grievance, since the real desire of the union was to modify the contract by an improper method.

 The Board disagreed with these conclusions of the Trial Examiner without, however, questioning his appraisal of the witnesses' credibility or rejecting his findings of operative fact. Disagreement was at the level of policy, on the question of what duty of disclosure an employer must bear in order to achieve the purposes of the Labor Management Relations Act. In this realm, committed to the expertise of the Board itself, a difference of view between the Board and its Trial Examiner does not raise the doubt about the substantiality of evidence which may be created by rejection of the Examiner's findings based on demeanor and credibility of those who testified in his presence. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 496, 71 S.Ct. 456 (1951).

## II.

 It is settled, as the point of beginning, that the National Labor Relations Board is not invested with a general responsibility for the interpretation and enforcement of collective bargaining contracts. Once the agreement is made, its own provisions govern the procedures for resolving disputes which arise under its terms. This policy is declared by Congress in Section 203(d) of the Labor Management Relations Act, 29 U.S.C. Sec. 173(d), providing, "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application of interpretation of an existing collective-bargaining agreement." Where, as here, the parties have agreed to formal grievance machinery, involving discussion and negotiation between their representatives, those procedures must be followed. If arbitration is established by the contract as the final step, again as here, the courts may not intrude to displace the arbitrator's function. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Here the Company and the union agreed that disputes about the interpretation or application of their agreement should be settled by internal grievance adjudication or finally by arbitration. Neither the Board nor this Court may ignore that agreement, to render a binding interpretation of the contract or to determine a disputed claim

of the Company's breach, if nothing more is at stake.

■ Upon these principles, this Court in Acme Industrial Co. v. NLRB, 351 F. 2d 258 (7 Cir. 1965), declined to enforce an order of the Board requiring an employer to disclose information sought for the processing of a grievance, since "factors bearing on a determination of the relevancy of the information requested are interrelated with a construction and application of the contract provisions." 351 F.2d at 260. The Supreme Court reversed in NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed. 2d 495 (1967). But in reversing our decision the Supreme Court did not impair the underlying principle that the interpretation of the contract is to be left primarily to the procedures agreed upon by the parties. On the contrary, the Court undertook to assure that those procedures would prove workable and effective in practice. The duty of an employer to deal with the employees' representative does not terminate with the execution of the contract. Rather, "the duty to bargain unquestionably extends beyond the period of contract negotiations and applies to labor-management relations during the term of an agreement." 385 U.S., at 436, 87 S.Ct., at 568. If grievance procedures, once agreed to, are to achieve their intended goal of resolving contract disputes, neither party can be allowed to refuse to participate. Thus the Act defines the parties' duty " 'to bargain collectively' as including 'the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to * * * any question arising [under an agreement] * * *.' " 385 U.S., at 436–437, 87 S.Ct., at 568. A corollary to the duty to meet and to confer is "the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." 385 U.S., at 435–436, 87 S.Ct., at 568. The refusal to supply such information thus constitutes

a refusal to bargain proscribed by Congress.

■ On these grounds, the Supreme Court's decision in NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565 (1967), confirms the power of the Board to require cooperative participation of the employer not only in the negotiation of the collective bargaining agreement but in its administration as well. Under its authority to order an employer to cease and desist from unfair labor practices, including refusals to bargain, the Board may enter where a court, exercising a power only to enforce the terms of the contract under Section 301 of the Act, would be foreclosed. In many cases, the same conduct that constitutes an unlawful refusal to bargain during the life of the contract may also amount to a breach of that contract. See, e. g., NLRB v. Strong, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). See Note, The NLRB and Deference to Arbitration, 77 Yale L.J. 1191 (1968). While a court would properly decline to act to enforce the contract until the contractual grievance procedures and arbitration had run their full course, the Board is not excluded by the parties' agreement from prohibiting that same conduct as an unlawful refusal to bargain under Section 8(a) (5) of the Act. Section 10(a) declares explicitly, "The Board is empowered * * * to prevent any person from engaging in any unfair labor practice * * *. This power shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise * * *." 385 U.S., at 437, 87 S.Ct., at 568.

■ As this controversy serves to demonstrate, the Board's power to compel the employer's participation in grievance procedures is essential to the effectiveness of those procedures. Here the parties have agreed to grieve on any dispute concerning the Company's interpretation or application of the contract. A union charge of breach of contract creates a "dispute" only upon the Company's denial of breach. The denial thus

gives rise to a duty to participate in the grievance procedures; the Company's position that there is no breach, and therefore no grievance, is self-contradictory. When the Company takes the predictable view that it has lived up to the letter of the agreement, the employer can ordinarily be expected also to seek to explain the union's complaint as an attempt to change the contract, not a valid charge of breach. This characterization of the union's position cannot excuse the Company from cooperating in the grievance procedures if they are to remain vital. But if the Board lacked power to compel participation over this invalid excuse, the union would be forced to proceed directly to a court,[3] where the defendant would be bound to participate whether or not he conceded the existence of a meritorious dispute. Such a court, by interpreting the contract, would displace the grievance procedures agreed to by the parties, in violation of premises accepted both by this Court's decision and the Supreme Court's reversal in *Acme,* and would make that agreement a dead letter. To give life to the agreement to settle questions of the interpretation and application of the contract through nonjudicial methods, the Board must stand ready to enforce it. The Company's assertion that the union seeks not to enforce the contract but to amend it remains available as a defense in grievance proceedings, but not as an excuse from full and fair participation.

### III.

In the exercise of its power to compel participation in grievance procedures agreed to by the parties, the Board must use care not to displace those procedures more than necessary, lest voluntary settlement be destroyed by the very act of compelling it. The path is narrow which trespasses neither upon the policy against displacing the parties' agreed-upon methods of resolving disputes, on the one hand, nor upon the policy against evading those agreed-upon methods, on the other. When information is sought by the union from the employer, to assist in the policing of the contract and the processing of grievances, questions of interpretation of the agreement will inevitably be involved. The Company's objection that the information sought is irrelevant to any issue of the Company's obligations under the contract may require, for a ruling, that the contract be interpreted to determine what obligations the Company has assumed. In these circumstances, the Board would displace the parties' contractual methods by rendering a final and binding interpretation, but would defeat the efficacy of those methods by allowing the employer to conceal information needed for processing the grievance. To accommodate the complementary policies, the Supreme Court laid down a test for disclosure requiring only "the probability that the desired information was relevant * * *." NLRB v. Acme Industrial Co., 385 U.S. 432, 437, 87 S.Ct. 565, 568 (1967). In ordering the employer to furnish requested information under this loose standard, the Board does not make a binding construction of the contract but leaves the question of definite and detailed interpretation to the parties' grievance machinery or to the arbitrator.

The considerations which counsel caution in determinations of relevance have equal application here. The Company's principal objection to disclosure is not based on irrelevancy but on legal insufficiency; it is said that no

---

**3.** Here the Company has refused to submit the controversy to arbitration, on the ground that there is no real disagreement about interpretation of the contract and thus no arbitrable dispute. This position short-circuits both voluntary methods of settlement: internal grievance procedures and arbitration. Even where an employer agrees to arbitration, if he refuses to disclose information relevant to the grievance process until the arbitrator first orders production, upon a finding of arbitrability, the internal grievance procedure is nullified, and arbitration "would be woefully overburdened." NLRB v. Acme Industrial Co., 385 U.S. 432, 438, 87 S.Ct. 565 (1967).

valid grievance has been presented, and that the union's real object is not to process a grievance but to amend the contract. As the Board's decision concedes, the union's position is ambiguous, susceptible of interpretation either as a grievable charge that the Company has violated its obligation under Paragraph 44 of the contract to "make every effort" to make available incentive jobs for the Swasey operators, or as a demand—not subject to grievance—that the contract be amended to take the Swasey operators out of the incentive classification. On one hand, the written grievance form is captioned as a direct claim of violation of Paragraph 44 of the contract. The reasons assigned in the claim are neutral, consistent with either interpretation, since they assert simply that the Swasey operators are not making enough money because not enough incentive work is available. It is unstated whether this unavailability is attributed to the Company's failure to provide incentive work as agreed, or to circumstances beyond the Company's control and thus beyond its contractual obligation.

On the other hand, the relief sought—transfer to a nonincentive category—was thought by the Trial Examiner to be foreclosed as a remedy, if a breach were found, by the terms of the contract itself, and was thus viewed as an unequivocal indicator that no real grievance was presented. If a binding interpretation of the contract on this issue were appropriate at this stage, and were not a matter to be left to the parties' agreed procedures for settling questions of interpretation, still the nature of the employees' complaint would remain in doubt. A written grievance form, prepared by a layman, is not to be construed with the rigor of a common law pleading and held fatally defective if duplicitous. Subsequent oral elaborations of the grievance made it plain that the union was asserting, at least in part, that the Company had violated the contract by diverting incentive work from the Swasey operators to newer automatic machines.

It is not the function of the Board, nor of this Court sitting in review, to decide the precise theory of the charge, to determine whether any charge of breach of contract is borne out by the facts, or to adjudge whether the employees could be compensated by a change of rates or a change of classification as the remedy for a breach if established. To support the Board's order, the probability that the claim may prove to have some merit will suffice. The Supreme Court's decision in NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565 (1967), recognizes an analogy to discovery in judicial proceedings, and quotes the comparable principle there applicable, from 4 Moore, Federal Practice, Par. 26.16[T], 1181 (2d ed.): "Examination as to relevant matters should be allowed whether or not the theory of the complaint is sound or the facts, if proved, would support the relief sought." 385 U.S., at 437, 87 S.Ct., at 569 n. 6. Pursuing the analogy, the proceeding should not be terminated because the claimant has joined an adjudicable claim with another which has no merit, under Rule 12(b), so long as some relief could be granted, nor because the specific relief requested could not be given, under Rule 54(c), Federal Rules of Civil Procedure.

Like a court asked to declare a dispute to be nonarbitrable, the Board when asked to declare a controversy to be nongrievable can avoid becoming "entangled in the construction of the substantive provisions of a labor agreement" only by ordering disclosure "unless it may be said with positive assurance that the [grievance] clause is not susceptible of an interpretation that covers the asserted dispute." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–583, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960). It is enough to determine that the union "is making a claim which on its face is governed by the contract", without "weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written in-

strument which will support the claim." United Steelworkers v. American Manufacturing Co., 363 U.S. 564, 568, 80 S. Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

With the information thus supplied, the union can make an intelligent appraisal of the merits of the members' complaint and an informed decision on whether to process the grievance. In the internal steps of the agreed procedures, the union can negotiate on a foundation of fact which may dispense with the need for arbitration or reveal that arbitration is unwarranted. The ultimate goal of industrial peace, upon terms voluntarily accepted by both sides, may thus be achieved.

In NLRB v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565 (1967), the union sought information on why and where certain machinery had been moved from the plant, in the context of a collective bargaining agreement which entitled employees to move to another plant if laid off or reduced in seniority by a shift in operations, and which limited the Company's right to sub-contract. The company denied a breach and declined to answer. Without a prior determination that the Company's action fell under either contract clause, the Supreme Court affirmed the Board's power to order disclosure. The authorities cited by the Company here do not remove this case from the scope of that holding. The Board's self-limitation in Hercules Motor Corp., 136 NLRB 1648 (1962), has been all but abandoned by the Board itself. See The Timken Roller Bearing Co., 138 NLRB 15 (1962). There is no question of the Board's power to alter its views through adjudicatory processes. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). The decision of the Fifth Circuit in Sinclair Refining Co. v. NLRB, 306 F.2d 569 (1962), was specifically disapproved, along with the decision of this Circuit, in the Supreme Court's opinion in the *Acme* case. We are bound to follow the law there declared.

The petition to set aside the order is therefore disallowed, and the cross-petition for enforcement of the order of the National Labor Relations Board is sustained.

Enforcement granted.