ANACONDA WIRE AND CABLE COM-
PANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Local Unions Nos. 1543, 983, 2224, and
1000, International Brotherhood of Elec-
trical Workers, AFL–CIO, Intervenors.

LOCAL UNIONS NOS. 1543, 983, 2224,
AND 1000, INTERNATIONAL BROTH-
ERHOOD OF ELECTRICAL WORK-
ERS, AFL–CIO, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

and

Anaconda Wire and Cable Company,
Intervenor.

Nos. 18485, 18517.

United States Court of Appeals,
Seventh Circuit.

June 15, 1971.

Edward R. Lev, Stuart Bernstein, Chicago, Ill., LeGrande L. Young, New York City, James W. Gladden, Jr., Chicago, Ill., for Anaconda Wire & Cable Co.; Mayer, Brown & Platt, Chicago, Ill., of counsel.

Laurence J. Cohen, Washington, D. C., Sherman, Dunn & Cohen, Washington, D. C., for petitioner Local Unions Nos. 1543, 983, 2224 and 1000 International Brotherhood of Electrical Workers AFL–CIO.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Marvin Roth, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Thomas E. Silfen, Atty., N. L. R. B., for respondent.

Before HASTINGS, Senior Circuit Judge, and KILEY and CUMMINGS, Circuit Judges.

HASTINGS, Senior Circuit Judge.

This matter is before us on dual petitions pursuant to Section 10(f) of the National Labor Relations Act, as amended, Title 29, U.S.C.A. § 151 et seq., § 160 (f), to review and set aside an order of the National Labor Relations Board.[1] In No. 18485, petitioner Anaconda Wire and Cable Company (Company) is seeking review of that portion of the Board's order which held the Company violated Section 8(a) (5) of the Act, Title 29, U.S.C.A. § 158(a) (5),[2] by failing to

---

1. The Board's decision and order is reported at 182 N.L.R.B. No. 35 (1970).

2. Title 29, U.S.C.A. § 158(a) (5) provides, *inter alia*:

"(a) It shall be an unfair labor practice for an employer—
"(5) to refuse to bargain collectively with the representatives of his employees * * *."

supply each of four local unions representing employees at four of its mills with information regarding incentive plans in effect at such mills. The Board has cross-petitioned for enforcement of its order against the Company. In No. 18517, petitioners Local Union Nos. 983, 1000, 1543 and 2224, International Brotherhood of Electrical Workers, AFL–CIO (IBEW), represent the employees at the four mills and are seeking review of the Board's order insofar as it directs the dismissal of portions of the complaint. The petitions were ordered consolidated by this court.

The Company is a manufacturer and seller of electrical wire and cables with facilities located throughout the United States. In late 1967 and early 1968, collective bargaining agreements at the Company's locations in Muskegon, Michigan, Marion, Indiana, Sycamore, Illinois and Watkinsville, Georgia expired. The production and maintenance employees in these plants, represented by IBEW Local Union Nos. 983, 1000, 1543 and 2224, respectively, engaged in economic strikes at various times after contract negotiations failed to result in new agreements.

There were Company-administered incentive wage plans in existence at each of the four plants prior to the expiration of the contracts. The administration of such plans was subject to arbitration and grievance procedures at the Marion and Watkinsville plants and grievance procedures at the Muskegon plant. The only incentive plan that had been reduced to writing was the one for the Marion employees and it had been incorporated into the collective bargaining agreement as a "General Outline for the Administration of the Bonus Payment Plan."

During the course of the 1967–1968 contract discussions, the Union made various proposals to improve the incentive plans or, in the alternative for the Marion plan, to abolish it. The Company rejected all such proposals and the subject of incentives was unresolved when Company and Union representatives met in Washington, D. C., at the end of June, 1968, in an effort to settle the strike.

At the bargaining sessions in Washington the Company negotiated with each local union separately, each meeting chaired by IBEW International Representative Lucas. On June 29, 1968, while engaged in a bargaining session for the Marion plant, Lucas raised the question of incentives. Company Vice-President Leader and Personnel Administrator White reiterated the Company's rejection of Union proposals to change the plans. Lucas testified he told Leader that "we really didn't even know what the incentive plans were because they weren't written out, and because they weren't our people felt the company would change those plans arbitrarily, or could." Leader then asked if the Union wanted a description of the incentive plan and what Lucas meant by "description." He replied, "Well, I would expect that incentive plan to be the normal language that would appear in a contract describing an incentive plan * * * such as the Hastings agreement * * * or like Marion, except that the Marion one is not complete." He then told Leader he thought the issue of incentives could be settled if the Company reduced to writing the incentive plans in effect prior to the strike, but that he would have to check with the local delegates and International Representative Young.

The following day, Lucas told Leader that incentives "was an item that would have to be settled before we could reach agreement," and explained that if the Company would reduce to writing the plans as they existed prior to the strike, then "possibly we could accept it." Leader pointed out that if the write-ups had to be presented prior to the settlement of the strikes, such settlement would be delayed several weeks. He, therefore, suggested that language could be incorporated in the settlement agreements to the effect that the Company would reduce the plans to writing after the strike was over and present them to the Union. Lucas and Leader agreed that the Com-

pany would draft such language for Union approval.

On July 1, 1968, Leader and White submitted proposed memoranda of agreement to Union representatives Lucas and Young. The memoranda for the Sycamore, Muskegon and Watkinsville plants contained the following paragraph:

"As soon as practicable after the employees return to work, the company will prepare a memorandum in which it will reduce to writing the incentive plan in effect at the time of the strike and will meet with the Union representative to discuss such memo."

While generally agreeing with the proposed language, Lucas and Young objected to the omission of such paragraph from the Marion memorandum. White argued that there was already incentive language in the Marion contract. However after Lucas pointed out that the agreement was to submit the incentive language to the Union's industrial engineer for discussion, White added the provision to such memorandum.

Lucas further demanded that the phrase "and include this as an addendum to the labor agreement" be added to the end of the language submitted by the Company. This was done. Also the Sycamore agreement included a handwritten note that the description of its plan was to provide for arbitration. Collective bargaining agreements for all four plants were subsequently executed incorporating the above paragraph as modified.

Pursuant to such agreements, the Union's industrial engineer Zalusky met preliminarily with the Company's industrial engineer Maher,[3] on November 22, 1968. At this meeting each man expressed his client's understanding of the obligations under the contracts with reference to the incentive plans. Zalusky testified that he "stated specifically * * * the information we needed to administer the wage incentive plan at the various Anaconda plants and what we expected to have included in these statements, the description of the plans."[4] Maher declared that he was not going to give the Union a guaranteed minimum statement on the earnings expectancy factor and Zalusky replied that this "presented no problem with the Union; with the exception of the variations in the amount of expectancy the language associated with the Marion agreement would be satisfactory." Maher testifed that he informed Zalusky that the 1964 Marion contract would be the outline to be used for all of the plants and that Zalusky responded he did not think that they were "going to have any problems."

There followed four more meetings, one for each plant, at which Maher presented generalized documents on incentive plans purporting to conform to the contract requirements. At the Sycamore meeting, Zalusky expressed his great disappointment with the highly generalized nature of the Company's proposals stating that this "was not what we had agreed to * * * or what we expected following" the preliminary discussions.

At such meeting, Zalusky asked the degree of accuracy to which the time studies were set and whether the Company used the "continuous" or "snapback" time study method.[5] Maher an-

---

3. Prior to the meeting, Maher had received written instructions from White that the write-ups "be somewhat along the lines of the incentive language * * * in [the] last Marion IBEW contract" and that "[t]here [was] to be no negotiating with the union" but that "we will * * * sit down at each location and discuss only the contents of the memorandum with John Zaluski, the IBEW Industrial Engineer * * *."

4. Specifically, Zalusky stressed that he wanted to know the accuracy and method of time studies, the types of allowances (personal needs, fatigue, unavoidable delay, etc.), the effect on bonus opportunity of machine limitations and the expected bonus earnings under the Company's incentive systems.

5. Under the "snap-back" method of time study, a stopwatch is brought back to

swered each question, in substance, by stating that it would depend on the nature of the operation. Zalusky also inquired as to the exact amount of the projected bonus opportunity, to which Maher responded that "you could figure it at 15 to 30 percent." Noting that the write-up provided that "the bonus opportunity will not be as great * * * where machine limitations exist," Zalusky asked how much bonus opportunity was built into machine controlled elements. Maher answered that it would "vary between machines," and that the amount of the variance would "vary with the operation."

At Marion, Maher presented Zalusky a three-page document which was substantially similar to the pre-existing Marion plan. The earnings expectancy provision was modified by the statement that "when machine limitations exist, the bonus opportunities will not be as great * * *." Zalusky inquired how much less bonus opportunity would be where such limitations exist and how much bonus opportunity was built into machine controlled portions of the operation. Maher explained that it would vary with the type of operations.

Zalusky then requested that specific statements be made with respect to time studies, machine limitations and the various allowances. Maher replied that he would take the proposals under consideration and that the Union could expect to hear from him within two weeks. Thereafter, Maher mailed to Zalusky a revised copy of the document submitted at the Marion meeting. The revisions consisted of two additional headings which recited, in substance, that the Company's selection of stopwatch techniques would be "dependent upon the type of operation" and that standard times would include allowances for personal, fatigue, unavoidable delay and interference "where applicable."

The Watkinsville and Muskegon meetings followed the same pattern. Maher presented the Union representatives with a one-page document at Muskegon and a two-page document at Watkinsville. Zalusky challenged each of the documents because of their lack of specificity and made proposals for the addition of specific items.

During the period that these meetings were taking place, Union Representative Lucas was in touch with Company Personnel Administrator White to protest the Company's failure to honor the memoranda of agreement. In a letter to White dated February 5, 1969, Lucas complained that the proposed Sycamore plan contained no "statement of 'earnings opportunity' expressed as a percentage of the hourly wage rate" despite the fact that employees' incentive earnings prior to the strike indicated that the Company did work with an established earnings opportunity during that period. Lucas then requested "immediate information in this regard so that we may schedule further discussion meetings." The letter was signed by Lucas as "Chairman, Anaconda Wire & Cable Negotiating Committee." White replied to the letter by stating that in his opinion the Company had satisfied its obligation under the contract.

After completion of all the meetings, Lucas sent another letter to White charging that the plans provided by the Company did not "contain the specific details which would necessarily comprise the actual incentive plan existing at each plant." He further explained that the statement of earnings opportunity requested in the February 5, letter was "merely illustrative * * * of the type of information which must be provided in order to represent a complete and meaningful incentive plan." Lucas again signed this letter as "Chairman, Joint Anaconda Wire & Cable Negotiating Committee." White responded to

zero after measurement of each element of the task. In the "continuous" method, the watch keeps running while the task is performed. The Unions prefer the continuous method.

such letter by stating that the Company believed it had no obligation to answer any letter written on behalf of the "Joint Anaconda Wire & Cable Negotiating Committee."

On the basis of the foregoing, the Board, contrary to its trial examiner, held the Company violated Section 8(a)(5) of the Act, *supra*, by failing to furnish the Unions with requested information relevant to the description of the incentive wage plans and to the administration of the contracts.[6] Accordingly, the Board ordered the Company to cease and desist from the unfair labor practices found, to furnish each of the Unions with the requested incentive wage plan data and to post appropriate notices. The Board upheld the trial examiner's dismissal of the portion of the complaint that charged the Company with violation of the Act for refusing to include specific details in the written descriptions of the incentive plans that were to be furnished the Unions pursuant to and become a part of the July 1 settlement memoranda.

### I.

Critical to each of the Board's holdings was its finding that "the parties did agree the [Company's] descriptions would be subject to negotiations with the Union but there was no agreement that they were to be limited solely to the precise form or language contained in the Marion contract."

The Company contends there was no agreement to negotiate the details to be included in the incentive plan write-ups and, therefore, no obligation to supply the incentive information. It is the Company's position that, during the pre-settlement negotiations, it retained the right to make unilateral decisions on incentives by successfully rejecting all Union incentive plan proposals. Thus, under the July 1 memoranda, the Company claims it was given unilateral power to record the existing incentive plans in a

form "like Marion," and that the meetings referred to were for the purpose of giving the Unions an opportunity to review such write-ups and ascertain if they were "like Marion." Finally, it argues that its obligation to "discuss" under the memoranda was no more than an agreement to "explain" the write-up language to avoid later misunderstanding. We are urged, therefore, to overturn the Board's finding.

The Unions, on the other hand, agree in part with the Board that the July 1 memoranda did contemplate negotiations, but vigorously contend that if such *negotiations* were to cover all details in the incentive write-ups, then such finding is erroneous.

■ It is well settled that factual determinations of the Board may not be set aside unless unsupported by substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487–488, 491, 71 S. Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Duncan Foundry and Machine Works, Inc., 7 Cir., 435 F.2d 612, 617 (1970). Likewise, inferences reasonably drawn by the Board may not be set aside simply because we would not have drawn them. N. L. R. B. v. Southern Bell Telephone & Telegraph Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250 (1943); N. L. R. B. v. Duncan Foundry and Machine Works, *supra*.

■ The precipitating factor in the agreement to reduce the incentive plans to writing was, as above stated, Union Representative Lucas' charge that the Unions "really didn't even know what the incentive plans were because they weren't written out, and because they weren't, our people felt that the Company would change the plans arbitrarily, or could." The Unions' concern over the Company's unbridled discretion in the changing of incentive plans theretofore exercised, coupled with the parties' failure to include a word connoting the use of unilateral power in their settlement

---

6. The Board contends that in reversing the trial examiner, it did not change any credibility finding or determination of operative fact.

memoranda, amply support the Board's determination that the word "discuss" was inserted to allow negotiations of the amount of detail to be included in the incentive plan write-ups.[7] As the Board appropriately observed, "A provision for such discussion would have little meaning if the description were to be left to the Company's unilateral, final decision."

The Company's contention that the write-ups were to be "like Marion" is refuted by the statement of Lucas, credited by the Board and the trial examiner, that the Unions desired a description of the incentive plans that was "like Marion, except that the Marion one is not complete." Indeed, the subject of incentives was initiated during the Marion discussions in Washington and the Union successfully bargained for the inclusion of the incentive write-up language in the Marion contract. Moreover, the Company's instructions to Maher only required the drafts to be "somewhat along the lines of Marion." The Board, on this evidence, could reasonably infer that the write-ups were not to be strictly "like Marion" since the evidence shows that the Union was not happy with the Marion incentive plan and it successfully got the Company to agree to submit the write-up of the plan for discussion.[8]

The Company's argument that the Board's decision reopens a subject that was foreclosed by bargaining and the strike settlements ignores the bargaining history. Throughout the contract discussions the Unions were demanding changes in the substance of the incentive plans. The Company successfully resisted all such changes. The Board's decision in no way undermines this bargaining victory. The Board's construction of the agreements does not require bargaining with respect to the substance of the incentive plans, nor does it even require the Company to include specific details in such plans, in derogation of its management prerogatives. All that is required is the submission of information relevant to the negotiation of the contents of incentive wage plans that are to be appended to the collective bargaining agreements and relevant to the administration of such plans.

Finally, there is no evidence in the record to support the Unions' position that when the Company orally agreed to reduce its pre-existing incentive plans to writing, it was thereby obligated to provide descriptions containing all of the "essential elements" of incentive plans. Rather, as the Board found, the parties to the negotiations were unclear as to what constituted a "description." The only hint of what was meant was Lucas' statement that a description should be "like Marion, except that the Marion one is not complete." Likewise, the written agreement between the parties provides no definition of the contents of the proposed write-ups. In view of the written agreement which contemplated discussion of such incentive plans, we think the Board was justified in determining that the parties did not agree to the inclusion of specifics in the written plans and instead contemplated negotiations.

On the basis of the foregoing, and having duly considered other factual contentions of the Unions and the Company,

7. We reject the Company's argument that Zalusky admitted the post-strike meetings were not negotiating meetings. It is clear that he did not consider them meetings for the negotiation of the *substance* of the plans, but his testimony indicates that he was to discuss the contents of such plans. As he said, "My function was to ascertain whether these were in fact an accurate and complete statement of these incentive plans."

8. Zalusky's reference to the Marion plan supports this conclusion. He stated, "Most of the language was already [in the Marion plan], not all of it but most of it was. It had been negotiated before, and as I understood there was a previous agreement describing the wage incentive plan at Marion * * * so it just followed that, in essence, this would be generally the plan, that we asked for additional specifics in regard to it, the allowances."

we conclude that the Board's above-quoted finding is supported by substantial evidence.[9]

## II.

■■ The Supreme Court has held that an employer has a "general obligation * * * to provide information that is needed by the bargaining representative for the proper performance of its duties." N. L. R. B. v. Acme Industrial Co., 385 U.S. 432, 435–436, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967). The Unions are entitled to such information for both the negotiation of new agreements and the administration of existing ones. P. R. Mallory & Company v. N. L. R. B., 7 Cir., 411 F.2d 948, 953 (1969); J. I. Case Company v. N. L. R. B., 7 Cir., 253 F.2d 149, 153 (1958). Since the Board has properly determined that the parties agreed to negotiate the details to be included in the write-ups of the pre-existing plans, there is no question here but that the details on the incentive plans allegedly sought were relevant to the Unions' duty to negotiate. Moreover, such information was relevant to the Unions' duty to administer such plans. Thus, if the Company refused to grant the Unions' request for information, the Board was justified in finding an unlawful refusal to bargain in violation of Section 8(a) (5), *supra*. N. L. R. B. v. Acme Industrial Co., *supra*.

The Company does not contest the applicable legal principles. Rather, it presents for our consideration two factual issues: (1) whether a proper request for incentive plan information was made; and (2) whether, in any event, such information had previously been provided the Unions.

The Company contends that the information requested by Zalusky at the post-agreement meetings and by Lucas in his letters to White was requested *solely* for the purpose of inclusion in the write-ups. Thus, it says that such requests were bargaining demands which it could lawfully refuse.

Zalusky's testimony demonstrates, at least, a dual purpose in his requests for information at the meetings. He testified, " * * * I stated specifically as I could essentially the information we needed to *administer* the wage incentive plan at the various Anaconda plants and what we expected to have included in these statements, the descriptions of the plans." (Emphasis added.) Moreover, the trial examiner, who generally found in favor of the Company, held that the Unions had requested the Company to furnish incentive information. Although the examiner refused to predicate a violation on the failure of the Company to provide such information since " * * * the meetings were held pursuant to an agreement reached in collective bargaining, and were not meetings to negotiate an agreement," this position was subsequently rejected by the Board.

■ We conclude that substantial evidence in the record considered as a whole supports the Board's finding that the Unions made proper requests for incentive wage information.[10] The fact that such proper requests may have been coupled with bargaining demands that could lawfully be refused does not diminish their efficacy and excuse the Company for its failure to supply such information. P. R. Mallory & Company v. N. L. R. B., *supra*, 411 F.2d at 955;

---

9. We agree with the Board that in determining this issue it differed with its trial examiner on the inferences to be drawn from the operative facts and that, therefore, the evidence relied on is not "less substantial" because of such disagreement. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 494–496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); P. R. Mallory & Company v. N.L.R.B., 7 Cir., 411 F. 2d 948, 952 (1969).

10. Moreover, as the Board explained, the Unions were "entitled to determine, by examination of the relevant information, what details [they] wished to request to be included, and it is entirely possible that upon such examination the Union might agree that more detail would not be desirable."

**1036**

*cf.,* Texaco, Inc. v. N. L. R. B., 7 Cir., 407 F.2d 754, 758 (1969).

■ The Company's argument that it had furnished the specific data requested by the Unions rests upon information given prior to the Washington meetings, oral responses given Zalusky by Maher at the post-agreement meetings, rate sheets available to employees at the various plants and incentive information available to a union member at the Marion plant.

Such contention fails, for example, on an examination of the facts supplied with respect to the accuracy or method of time studies. Although Zalusky specifically questioned Maher with respect to both accuracy and use of stopwatch methods at the various meetings, Maher's response was to the effect that it would depend upon the operation. Nowhere in the submitted written materials is there a statement of accuracy for the time studies and in some instances, there is not even a statement as to whether the Company was using the "continuous" or "snap-back" stopwatch study method.

Likewise, the Unions asked about the nature of the bonus opportunity built into machine controlled operations. In each of the submitted write-ups the bonus opportunity was said to be subject to machine limitations. Maher's only response was, again, that it depended upon the operation. At most, rate sheets were provided in the written materials previously given the Unions which would allow an employee to mathematically determine his bonus for a particular working period, but which in no way told of the nature of such limitations.

■ Finally, even if some information were available to the Unions through employees as the Company contends, this does not relieve the Company of its duty to supply such information directly to the Unions. Texaco, Inc. v. N. L. R. B., supra, 407 F.2d at 758; N. L. R. B. v. Northwestern Publishing Company, 7 Cir., 343 F.2d 521, 525 (1965).

We find that the record considered as a whole amply supports the Board's holding that the requested information was not supplied by the Company. Accordingly, having considered other arguments raised by the Company and finding them without merit, we conclude that the Board was justified in holding Anaconda Wire and Cable Company in violation of Section 8(a) (5) of the Act, *supra.*

### III.

■ The Unions urge that the Company further violated the Act by refusing to reduce to writing a full and meaningful incentive plan for each of the plants. They correctly assert that an employer is legally obligated to incorporate into writing any agreement reached during negotiations or any employment practice currently being observed. In their view, since the plans were already a condition of employment at the plants and the Company had agreed to reduce such plans to writing, the Company was under a "dual statutory obligation to provide an adequate written description of each plan as it actually operated."

■ This construction of the agreements between the Unions and the Company ignores the factual finding of the Board which we upheld in Section I of this opinion, *supra.* The Board found there, in substance, that the parties agreed to negotiate over *any* inclusions on the proposed write-ups of the incentive plans. If the Board were to find violation of Section 8(a) (5) of the Act for the Company's refusal to include details in the write-ups that were to be the subject of negotiations, it would, in effect, "compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements," in clear violation of Section 8(d) of the Act.[11] N. L. R. B. v. American

11. Section 8(d) of the Act, Title 29, U.S.C.A. § 158(d) provides in relevant part:
"(d) * * * [S]uch obligation [to bargain collectively] does not compel either party to agree to a proposal or require the making of a concession * * *."

Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). See also, H. K. Porter Co. v. N. L. R. B., 397 U.S. 99, 106, 90 C.Ct. 821, 25 L.Ed.2d 146 (1970).

Amalgamated Clothing Workers v. N. L. R. B., 2 Cir., 324 F.2d 228 (1963), cited by the Unions, is inapplicable to the instant case. In *Amalgamated Clothing Workers* the trial examiner and the Board both found that the employer had *agreed* to continue to use a 12½ per cent incentive factor in computing piece rates, but that it refused to reduce such agreement to writing. The court reversed the Board's dismissal of the complaint and held the employer in violation of Section 8(a) (5) for its refusal to incorporate such agreement in a written contract. In the instant case, although the Company agreed to reduce its incentive plans to writing, it further agreed, with the Unions, to negotiate the contents of such plans.

We conclude, therefore, that the Board's dismissal of the portions of the complaint that charged the Company with violation of Section 8(a) (5) for refusal to reduce to writing full and meaningful incentive plans for each of the plants was supported by substantial evidence and may not be disturbed on review.

IV.

We have for final consideration the Company's complaint that the Board's order is ambiguous in that it may be read to mean that *"all* unions represent *all* employees at the Company's various installations." Because the issue of joint or coordinated bargaining was assertedly a major issue during the 1968 contract negotiations and one which the Company won, its concern is that the Board's order may cast doubt upon the appropriate bargaining units. All parties conceded on oral argument that any potential ambiguity could be corrected by the insertion of the word "respectively" in paragraph 1(a) of the Board's order following the phrase "as exclusive bargaining representatives of all employees in the appropriate collective bargaining

units." Since no one objects to such insertion, the Board's order will be so modified.

Having concluded that the Board's findings and conclusions are supported by substantial evidence and that the order as modified is in all respects valid, in No. 18485 we grant enforcement of such order, as modified, and deny the petition for review filed by the Unions in No. 18517.

Enforcement of order, as modified, granted.